(No. 6604.   December 27, 1938.)

PATSY ANN MANION, DONNIE MANION, DAVIE MANION and JOYCE MANION, Minors, By and Through EVA MANION, Their Guardian Ad Litem, and EVA MANION, Respondents, v. EDGAR WAYBRIGHT, Appellant.

[86 Pac. (2d) 181.]

Whitla & Knudson, for Appellant.

N. D. Wernette and W. B. McFarland, for Respondents.

MORGAN, J.—This action was commenced by the widow of William Manion and her minor children, the issue of her marriage to Manion, against Edgar Waybright (who conducted his business under the trade name of Waybright Produce Company) and George M. Watson, one of his employees, for damages resulting from Manion's death. It is based on the theory that Manion was killed as the result of an accident which occurred while he was riding as a guest in a Ford sedan delivery automobile, the property of Waybright and used in his business; that Watson, while engaged in the performance of the duties of his employment by Waybright, drove the automobile in a grossly negligent manner and thereby caused Manion's death. Judgment was for plaintiffs, from which and from an order denying a new trial, an order denying a judgment notwithstanding the verdict and an order overruling a motion to tax costs, Waybright has appealed.

March 17, 1937, Waybright was, and for a number of years prior thereto had been, engaged in business as a wholesale merchant of fruits and vegetables, with headquarters at Spokane, Washington. He distributed such produce in Spokane and in neighboring cities and villages. Watson was employed by Waybright as a traveling salesman. His territory included Coeur d'Alene, St. Maries, Kellogg, Wallace and intervening points in Idaho. It was Watson's duty to call on merchants in his territory and sell them goods of his employer and, occasionally, to make deliveries. To enable him to perform his duties Waybright furnished Watson the Ford sedan delivery automobile above mentioned. Watson's hours of employment were not fixed and he worked, not only in daytime, but frequently until late at night. When his day's work was done he generally returned for the night to his home in Coeur d'Alene but, occasionally, when the duties of his employment required his presence in Spokane at an early hour next day, he went to that city and spent the night there.

Manion and his family lived in Spokane where he was employed. A few years prior to his death he worked as a

miner near Kellogg and he desired to go there in order, if possible, to find work at better wages than he was receiving. A friendship of long standing existed between Watson and Manion. Shortly before March 17, 1937, they had a conversation about Manion's desire to go to the Coeur d'Alene mining district in search of employment and it was agreed between them he would go there with Watson on one of the latter's business trips.

The morning of March 17, Manion rode from Spokane to Coeur d'Alene in a truck belonging to Waybright, which was driven by Watson's brother. From Coeur d'Alene to Kellogg he rode with defendant, Watson, in the Ford sedan delivery automobile. Watson made the trip in the discharge of the duties of his employment by Waybright. After reaching the Coeur d'Alene mining region the men separated, Watson going about the business of his employment. During the afternoon, according to Watson's testimony, Manion became intoxicated. He also testified that, about 9:30 o'clock at night, at the time he had finished with his last customer in the district, he and Manion started on the return trip, and that Manion was still under the influence of liquor.

The road between Coeur d'Alene and Kellogg was in bad condition and the use of it by heavily loaded trucks was prohibited. On account of this condition Watson had made arrangements with his employer's customers in Wallace and Kellogg whereby a carload of produce was to be shipped by rail from Spokane for delivery to them, and it was necessary for him to be at the place of business of his employer, in that city, about 6:00 o'clock the morning of March 18, in order to supervise and assist in loading the car. He testified that when he left Kellogg on the night of March 17, he had in mind to be at Waybright's place of business in Spokane at 6:00 o'clock, or thereabout, the next morning. The two men proceeded in the automobile from Kellogg to near Coeur d'Alene at a speed of not to exceed 35 miles an hour, because of the condition of the road. Near Coeur d'Alene, and from there to Spokane, the road was good and they traveled, except through the city of Coeur d'Alene, at about 50 miles an

hour where the highway was straight and there were no traffic hazards.

Watson, called by respondents as a witness pursuant to I. C. A., sec. 16–1206 (which permits a party to an action to be called and interrogated by his adversary as on cross-examination, and provides that the party calling him may rebut his testimony by other evidence), testified he intended to take Manion home, and also intended to go to Spokane and stay there over night so he could be at his employer's place of business at 6:00 o'clock the next morning. On examination by his counsel he testified that, had Manion not been with him, he would have stayed all night at his home in Coeur d'Alene; that his main purpose in going to Spokane that night was to take Manion home:

"Q. Was there any other purpose that actuated you in that respect?

"A. No, I intended, as long as I was taking him in, that I would be there the next morning.

"Q. For what purpose?

"A. To be at the office the next morning."

The automobile was equipped with a front door on each side and double doors in the rear end. When it was purchased it had a driver's seat immediately back of the steering wheel and had no other seat than that. Shortly after it was delivered to Watson, he equipped it with a removable, folding seat, referred to in the record as a "jump" seat, to be placed beside the driver's seat for the use of anyone riding with him. Manion sat in the jump seat during the trip from Coeur d'Alene to the mining district and, until the accident, in returning therefrom.

It was a dark night. Watson drove along the highway in a westerly direction from Coeur d'Alene, toward Spokane, at a rate of speed which he estimated to be about 50 miles an hour. When he reached a slight curve at a point 6 or 7 miles west of Coeur d'Alene, he failed to follow the pavement but drove into the ditch immediately north of it. The ditch was approximately 3 feet deep and the automobile followed it, according to the testimony of the sheriff and prosecuting attorney who examined the tracks, about 435 feet, where it

stopped against an embankment, 12 feet wide, which constituted an approach across the ditch to the highway. It backed 35 feet, swung about 2 feet to the right, crossed the approach and stopped in the ditch against the embankment on which the pavement was built, the rear of it being about 25 feet west of the approach. Before crossing the approach the automobile collided with a post in the fence along the right-of-way, breaking the glass in the door next to which Manion sat. During the time the automobile was traveling along the ditch Manion fell, or otherwise disappeared, from it.

Shortly after the automobile stopped against the bank of the highway a man drove up. According to his testimony the following occurred:

"Q. Say anything?

"A. Yes, I hollered 'hello' and someone answered me and I asked if there was anyone hurt or if there was anything I could do and they said 'no, we are just out of gas.'

"Q. Would you say there was more than one or just one?

"A. No, just one.

"Q. Just one? What, if anything further, was said?

"A. I said 'it was pretty hard to get gas out of my car.' As I understood, he said something about having gas in the can. I don't just remember what that was.

"Q. Then what did you do?

"A. I went home."

A little later other men, traveling along the highway, stopped and assisted Watson to get the automobile back on the pavement.

Watson's account of the accident is unsatisfactory. He testified he went to sleep, without any warning sense of drowsiness. He was asked:

"Q. Do you know where you went to sleep?

"A. No, sir.

"Q. Did you go to sleep?

"A. Yes, sir.

"Q. Where do you recall the last of being conscious as to what was going on prior to the time you went into the ditch?

"A. I don't know.

"Q. Don't know? Did you wake up when you hit the bottom of the ditch?

"A. I don't know just where I woke up or just where I was out there in the ditch when I did wake up.

"Q. You don't?

"A. No, sir. .

"Q. When you woke up was Manion with you?

"A. No, sir, as far as I can recall, he wasn't.

"Q. But you don't know where, with reference to the place that you went into the ditch to the approach from the north —that little approach or by-road, you don't know where you were when you woke up?

"A. No, sir, I don't.

"Q. Were you awake when you ran into that post on the north side?

"A. If I was—

"Q. Well, do you know whether you were?

"A. I don't know.

"Q. You don't know?

"A. No.

"Q. You remember of hitting that post?

"A. No, sir.

"Q. You don't know whether you hit that post at all or not?

"A. I know I must have hit the post. I don't remember it.

"Q. You don't remember it?

"A. No, sir.

"Q. You remember of hitting the approach?

"A. Not definitely, no, sir.

"Q. Not definitely? You know that you backed up?

"A. No, sir.

"Q. You don't know that?

"A. No, sir.

"Q. Were you still asleep?

"A. I don't know, sir.

"Q. Do you remember driving or going across that approach?

"A. No, sir.

"Q. You don't remember that?

"A. No, sir.

.   .   .   .   .   .   .   .   .   .   .   ..   .   .   .

"Q. George, as you went down that ditch, will you just show the jury the position that you were occupying in that car? Just demonstrate, if you will, so that you can—show the posture?

"A. As I went into the ditch?

"Q. As you drove down?

"A. I was sitting in this narrow driver's seat. I had my hands, of course, on the wheel and undoubtedly I had my feet braced here. I was leaning—the seat was too far behind for me for most driving anyway. I was taking the wheel in both hands and I was leaning ahead from the back of the seat as I am now. I had my feet braced there trying to keep the car in an upright position as I proceeded along the slope or side of this ditch."

Watson testified he received no personal injury from the accident and that he had drunk no intoxicating liquor. He further testified he called Manion's name, two, three or four times, when he discovered he was missing, and got no response.

Watson said nothing to the man who first spoke to him, nor to those who helped him from the ditch, about having lost Manion but, as soon as he got the automobile back on the pavement, went on toward Spokane, about three-quarters of a mile, and turned around and returned to Coeur d'Alene where he spent the remainder of the night at home, until about 4:00 o'clock A. M. He made inquiry, by telephone, of one of the men who helped him out of the ditch, if he had seen anyone along the highway, or picked anyone up. He then went to the sheriff's office and reported the accident, and the disappearance of Manion, to the officer on duty. Thereafter he started to Spokane and, on arriving at the scene of the accident, found Manion's dead body beside the

highway. He immediately reported the tragedy to the sheriff.

Shortly thereafter the sheriff and prosecuting attorney arrived and found Manion's body 17 feet back of where the rear of the automobile had stopped, as last above stated. His feet were lying across the right track, his watch and the jump seat were near his body, his hat was in the ditch about 55 feet east of it, his lip and nose were cut and there was a hole broken into his skull immediately back of the upper part of his right ear.

The prosecuting attorney testified as follows:

"Q. . . . : While you were talking with him, was there anything said by Mr. Watson to you relative to where they were going or what he was doing while he was going past there that night?

"A. Yes, sir.

"Q. What did he tell you?

"A. It developed out of the conversation—we asked if he knew the man and he said he did, that he had been with him all day particularly towards Wallace and Kellogg and that he lived in Spokane and that he did not take him home with him that night because he had to be in the Waybright Produce Company warehouse that morning at 6:30 and that he was on his way then. That was why he done it."

Appellant complains of the action of the court in denying his motions for nonsuit, for directed verdict and for judgment notwithstanding verdict. These motions were grounded on the contention that, at the time of the accident, Watson was not acting in the scope of his employment, that in permitting Manion to ride with him in the automobile he violated his employer's rule and instruction against carrying passengers and that appellant was, therefore, not liable.

The same rule of law applies to each of these motions. In each case, the party making the motion admits the truth of his adversary's evidence, and his adversary is entitled to the benefit of every inference favorable to him which may be drawn legitimately from any evidence before the court at the time the motion is made. (*Hobson v. Security State Bank*, 56 Ida. 601, 57 Pac. (2d) 685.)

We approve a statement, applicable to this case, found in *International Co. v. Clark*, 147 Md. 34, 37, 127 Atl. 647, 648, by the Court of Appeals of Maryland. After citing a number of cases, that court said:

"The cases referred to firmly establish the law as being that, if the automobile causing the accident belongs to the defendant and is being operated at the time of the accident by one in the general employ of the defendant, there is a reasonable presumption that at such time he was acting within the scope of his employment and in furtherance of his master's business, and that this presumption is only *prima facie* and may be rebutted and overcome by evidence adduced during the trial, by the testimony of any of the parties to the suit. It is equally well settled that where the evidence offered to establish facts which would rebut this presumption is contradictory, the question is one for the jury; but where the facts so offered are undisputed and uncontradicted, it becomes properly a question for the court. It might be added that where the facts are such as to leave the court in doubt as to this question, the proper course is to submit the case to the jury, it being their function to pass upon the weight of the evidence."

(*Willi v. Schaefer Hitchcock Co.*, 53 Ida. 367, 25 Pac. (2d) 167; An Automobile Accident Suit (Anderson), pp. 657, 658; Blashfield, Cyclopedia of Automobile Law and Practice, vol. 9, sec. 6064.)

The evidence shows appellant had established a rule forbidding drivers of motor vehicles used in his business from carrying passengers therein, and Watson testified he had heard of the rule. The evidence also shows some of the drivers, including Watson, sometimes carried passengers. Appellant testified he had no knowledge of the rule having been violated, but there is substantial evidence, sufficient to justify the jury in finding, that the violation of the rule was so common and notorious appellant must have known of it, and that it had been abrogated thereby.

Appellant urges that had it not been for Manion's presence in the automobile, and the necessity to take him home, Watson would have stopped for the night in Coeur d'Alene,

would not have been on the way to Spokane at the time the tragedy occurred, and, in making the part of the trip from Coeur d'Alene toward Spokane, he was not acting within the scope of his employment. In *Magee v. Hargrove Motor Co.*, 50 Ida. 442, 446, 296 Pac. 774, 775, we said:

"Generally speaking, the owner of an automobile can be held responsible for its negligent operation by another only when, at the time of the accident, the relationship of principal and agent or of master and servant existed between the owner and the operator, and the agent or servant was at that time acting in furtherance of the owner's business. . . . . Thus, if it be shown that the person driving the car was at the time of the accident an independent contractor, or an agent or servant of the owner but using the car for his own business or pleasure, the owner is not subjected to liability."

██ ██ Although the evidence is susceptible to inference to the contrary, let us assume that, had it not been for the necessity of taking Manion home, Watson would have stopped for the night in Coeur d'Alene. It does not follow he was not within the scope of his employment when the tragedy occurred. Undoubtedly his employment made it necessary that he be in Spokane early the next morning. Whether he went there late the night of March 17, or early the morning of March 18, was immaterial; that the presence and condition of Manion made the trip on the night of March 17, preferable, and caused the journey to be undertaken then, does not alter the fact that Watson was going to Spokane to supervise and assist in loading the car of vegetables, which was a duty he owed his employer, as was his making the trip in order to do it. Whether he went that night or the next morning was for him to decide and his going when he did was neither departure from, nor inconsistent with, the duties of his employment. (*Christie v. Robinson Const. Co.*, 59 Ida. 58, 81 Pac. (2d) 65; *Wineland v. Taylor*, 59 Ida. 401, 83 Pac. (2d) 988; *Le Sage v. Le Sage*, 224 Wis. 57, 271 N. W. 369; *Forsberg v. Tevis*, 191 Wash. 355, 71 Pac. (2d) 358.) The rule is thus stated in Restatement of the Law of Agency, vol. 1, p. 529, sec. 236:

"An act may be in the scope of employment, although done in part to serve the purpose of the servant or of a third person."

Appellant insists Manion was not his guest and was not carried as a passenger in the automobile in the interest of his business. That contention is beside the point. In *Willi v. Schaefer Hitchcock Co.* (on petition for rehearing), 53 Ida. 367, 25 Pac. (2d) 170, we said:

" . . . . the rule is that it is a question of the agent's right or authority to invite a guest to ride, not the nature of the activity of, or the business or reason for, the guest being in the car, other than that he was such authorized invitee, which determines the master's or employer's liability."

The questions as to whether Watson had appellant's permission to allow passengers, including Manion, to ride in the automobile, and as to whether at the time of the accident it was being used, in whole or in part, in appellant's service, or for the advancement of his business, were for the jury. The orders overruling appellant's motions for nonsuit, for directed verdict and for judgment notwithstanding verdict, were not erroneous.

Appellant complains of the action of the judge in refusing to permit him to cross-examine Watson. Watson was appellant's co-defendant and, as heretofore stated, was called for cross-examination by plaintiffs pursuant to sec. 16–1206 of the code. No objection was sustained to questions propounded to him by appellant's counsel in the form of direct examination and, it appears from the record, appellant's counsel examined him fully, and at length, on matters touched on by respondents in their cross-examination of him. Furthermore, appellant did not call Watson for cross-examination. The rulings were not erroneous, but if they had been, the error would not have been prejudicial, because it does not appear appellant suffered disadvantage from them.

Complaint is made of refusal to instruct the jury to the effect that statements of Watson, made after the accident, with respect to it, were not binding on appellant. When objection was made to the introduction of these statements in

evidence as against appellant, the judge ruled they were not binding on him. Commenting on this state of the record, counsel for appellant say in their brief:

"The court ruled at the time that these statements would not be binding on the Waybright Produce Company, but refused to give instructions."

We are not prepared to say that, the agency of Watson having been shown, his statements after the accident would not be binding on his principal, but we do say that, even though they were not binding, the rulings, in the presence of the jury to the effect that they were not binding on appellant, rendered an instruction to the same effect unnecessary.

Appellant urges the evidence is insufficient to sustain the verdict and that it leaves the cause of Manion's death in a state of uncertainty. In *Newman v. Great Shoshone etc. Power Co.*, 28 Ida. 764, 156 Pac. 111, it is said, in the first paragraph of the syllabus, which was by the court and correctly reflects the decision on this point:

"In a civil case it is not necessary that the facts upon which the verdict is based be established beyond a reasonable doubt. It is the duty of the jury to decide according to the preponderance of the evidence and the reasonable probability of truth."

In that case we quoted from *Adams v. Bunker Hill etc. Min. Co.* (on rehearing), 12 Ida. 643, 650, 89 Pac. 626, 628, 11 L. R. A., N. S., 849, 852, as follows:

"There are very few things in human affairs, and especially in litigation involving damages, that can be established to such an absolute certainty as to exclude the *possibility*, or even some *probability*, that another cause or reason may have been the true cause or reason for the damage rather than the one alleged by the plaintiff. But such *possibility*, or even *probability*, is not to be allowed to defeat the right of recovery where the plaintiff has presented to the jury sufficient facts and circumstances surrounding the occurrence as to justify a reasonable juror in concluding that the thing charged was the prime and moving cause."

See, also, *Watkins v. Federal Life Ins. Co.*, 54 Ida. 174, 29 Pac. (2d) 1007; *Pierstorff v. Gray's Auto Shop*, 58 Ida. 438, 74 Pac. (2d) 171.

This action is governed by sec. 48–901 of the code, which provides:

"No person transported by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause for damages against such owner or operator for injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of the said owner or operator or caused by his gross negligence or his reckless disregard of the rights of others."

Fortunately, it is not necessary that we decide what the legislature meant by an accident which "shall have been intentional on the part of the said owner or operator." The evidence is ample to justify a conclusion on the part of the jury that Watson was guilty of gross negligence and acted with reckless disregard of the rights and safety of Manion in driving as he did.

It is contended the verdict is excessive and was prompted by passion and prejudice. The jury awarded respondents $15,000 general damages and $230 because of funeral expenses incurred by them. Sec. 5–311 of the code, which has to do with the amount of recovery for death, by wrongful act or neglect of another, provides: "such damages may be given as under all the circumstances of the case may be just." Neither the amount of recovery, nor anything else in the record, convinces us the jury was actuated, in reaching its verdict, by passion or prejudice.

A number of assignments of error are predicated on instructions given and requests for instructions, by appellant, which were refused. It would unduly extend this opinion to discuss these assignments separately. We have examined the instructions given and the requests which were refused and find no error in the actions of the judge with respect to them.

The motion to tax costs, which was overruled, presents a number of objections to the cost bill filed by respondents. The cost bill contains an item of $10, being the

amount of a premium on a cost bond demanded of respondents by appellant in the district court. That item is excessive. Sec. 40–2110 of the code limits the amount of recovery of costs which may be allowed for premium on such bond to 1 per cent. of the amount of liability thereon for each year it has been in force. The liability on this bond was $300 and it was in force during one year only. That item should be reduced from $10 to $3. The motion, with respect to other items, was properly denied.

The order denying the motion for a new trial and the order denying judgment notwithstanding the verdict are affirmed. The cause is remanded to the trial court with direction to modify the judgment by reducing the item of $10, paid by respondents as premium on bond, to $3. The judgment, so amended, is affirmed. No costs awarded.

Holden, C. J., and Ailshie and Givens, JJ., concur.

Budge, J., dissents.