(No. 6739. June 5, 1940.)

BOISE STREET CAR COMPANY, a Corporation, Respondent, v. C. W. VAN AVERY, as an Officer and Representative of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Local Union No. 1055, E. F. McINTIRE, as Local Chairman of Sub-local Union No. 1055 of the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, C. W. VAN AVERY, E. F. McINTIRE, PAUL BENNETT, EMMITT LIND, OWYHEE CAB CO., ORVILLE OSBORNE, STEVE SABIN, CECIL B. HOWELL, J. E. AKARD, OTTO VANDERSHEL, O. T. JEVONS, WILLARD D. BELL, JESS PHIPPS, ORIN R. RAYMOND, H. BURLINGAME, A. W. LANGDON, EMORY HURST, AL E. KNAPTON, R. E. PENIX, R. E. STEVENS, H. A. STONER, W. R. STODDARD, FRANK VANDERSHEL, BEULAH McINTIRE, E. F. McINTIRE, FRED McCABE, ALBERT LAMBERT, GEORGE W. MURPHY, W. J. HARTMAN, RALPH ROTH, S. M. BLESSINGER, HOWARD A. CARTER, DON CHASE, ROSCOE I. HICKEY, and the Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, Local Union No. 1055, and Sub-local Union of Said Association, Appellants.

[103 Pac. (2d) 1107.]

J. N. Leggat, Laurence E. Baird and K. C. Tanner, for Appellants.

J. M. Lampert and Wm. F. Galloway, for Respondent.

MORGAN, J.—Respondent, herein called the company, is a corporation engaged in operating a fleet of motor buses in Boise and immediately surrounding territory, and has an exclusive franchise from the city to conduct that business. In May, 1937, it had twenty-two motor bus drivers in its employ who, during that month, formed a labor union called Can-Ada Bus Drivers Association, herein referred to as the association. Its articles of organization provided for election, by its members, of a president, vice-president, secretary and two managers, and that said officers and managers should constitute an executive committee to conduct its affairs, subject to the right of any member affected by a decision of the committee to appeal therefrom to the entire membership. It was also provided in the articles that questions involving the status of a member, and matters involving policy in collective bargaining with an employer, should be voted on by secret ballot, and any other question coming before the association for decision should be voted on by secret ballot at the request of two members.

June 30, 1937, the association entered into a contract with the company wherein it was agreed:

"WHEREAS, it is the desire of the company and the association to enter into an agreement providing for the exclusive employment of members of said association as drivers of said buses; for fixing the terms of employment; for establishing the rates of pay; for providing for the hiring and discharge of said members; for the fixing of seniority rights of each member; for the arbitration of disputes, and for the efficient operation of said buses and courteous treatment of all bus patrons;

"NOW, THEREFORE, this agreement witnesseth, that for and in consideration of the mutual covenants and agreements in this memorandum contained, the company and the association agree as follows:

1. "The association agrees to furnish to the company a sufficient number of able and skilled association member drivers to properly maintain its schedules and render efficient service over all of its routes free, as far as reasonably possible, from justifiable complaint.

"The company agrees to employ as drivers in the operation of its buses only such members of said association as shall be approved and certified to said company by said executive committee of said association, *provided*, that the company may assign one or more non-association drivers of its own choice to operate any one or more of its said buses when the run to which the non-association driver may be assigned does not require more than one hour's time, or when an accredited association member shall not be available for duty as a driver.

2. "The executive committee of the association shall have sole authority to discipline or discharge any association driver. Said committee may act upon its own initiative, but shall act upon complaint being filed with the secretary of said committee by any officer of the company.

"Complaints filed by the company against any member of the association, which are not of an emergency character shall be considered by the executive committee of the association within a reasonable length of time after complaint has been filed and discipline and penalties imposed, if any, as such committee may determine; provided, however, that at any meeting where such non-emergency company complaints are considered, the company shall be entitled to representation at said meeting, and shall be given a hearing by said committee if so requested. But, said company representation shall have no voice in the determination of the discipline or penalty, if any, that said committee may decide to impose upon the association driver charged in the complaint.

"In emergency cases, the company shall have the right to remove from duty, any association driver for cause and without previous notice· to the association or its executive committee. In the event of removal from duty by the company of any association driver, under the authority of this paragraph, the executive committee of said association shall be notified of such action by the company as soon thereafter as reasonably possible. Thereupon the executive committee of said association shall investigate the merits of such action and make its own findings in relation thereto. At any meeting of the executive committee of said association where the matter of such emergency action by the company will be con-

sidered, the company shall be permitted representation and shall be given a hearing by said committee, if so desired. In the event the company objects to the decision made by the executive committee on any emergency removal of any association driver from duty, the association hereby agrees to arbitrate by submitting the case to which objection is made to an arbitration board consisting of one member to be chosen by the association, one member to be chosen by the company and the third member to be chosen by the other two. The association and the company hereby agree that the decision of the arbitration committee will be final, and each party agrees to fully abide thereby.''

Wages to be paid by the company to its employees were fixed in the contract, and it was therein provided that two weeks vacation on full pay should be given each employee who had been in the service of the company one year or more as a regular run driver; also that vacation periods should be fixed by the executive committee of the association in such manner as not to impose needless difficulty or expense on the company. It was provided that working hours for drivers, effective January 1, 1937, should remain unchanged and that the wage scale should be subject to change at any time, by agreement between the company and the association. Seniority rights of drivers, both as to pay and choice of runs, was to be determined by length of service, and determination thereof was left entirely to the control of the association. Granting of leaves of absence to drivers was placed in the discretion of the executive committee of the association, which was given the exclusive right to decide as to loss of seniority by reason of leave of absence. It was provided that all routes, or runs, in addition to those in existence on the date of the contract, should be known as extra, or temporary, runs until the feasibility of their continuance be proven to the satisfaction of the company and the association and, when so proven, should be considered regular runs.

The record shows the contract was in force from June 30, 1937, until February 2, 1939. At all times while it was in force the members of the executive committee of the association had access to the books of the company, in order to

familiarize themselves, if they desired to do so, with the amount of its earnings, and of its ability to pay expenses, including wages.

January 27, 1939, Joseph J. Turner, manager of the company, was told he was about to be confronted with labor trouble. At that time the company was contemplating the purchase of buses and one of the conditions of the purchase was that Turner must obligate himself, personally, together with the company, to pay for them. He asked the secretary of the association to call a meeting in order that he might lay the matter before the drivers. This meeting was held January 28, 1939. Turner addressed it and stated what he had heard about prospective labor trouble; that he was contemplating the purchase of buses and that if he did so he must make himself responsible, personally, for the purchase price; also that he did not desire to do this if labor trouble was impending, and asked for an expression from the drivers as to whether they desired to continue the relations between the association and the company, as they existed. He then retired from the meeting and a vote was taken, by secret ballot, on the question, "Shall we continue the association as is?" The vote resulted in the affirmative by a majority of eighteen to three. Later one of the employees expressed doubt to Turner as to whether the vote reflected the real sentiment of all the drivers. Thereupon he asked the president and secretary of the association to procure, if they could, a statement in writing from the drivers as to how they stood. They did so and a statement was signed by twenty of the twenty-two drivers, as follows: "January 31, 1939 This is to certify that we, the undersigned, will protect and support the Can-Ada Bus Drivers Association *100%.*"

That document was delivered to Turner the morning of February 1, 1939. About an hour after its delivery a Mr. Mumbach, of Portland, Oregon, executive officer and business agent of Division No. 1055 of Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America, called on Turner and stated he was the representative of a majority of the bus drivers of the company; that he had with him the signed applications of fourteen of the

drivers, out of a total of twenty-two, and displayed money which he said had been paid to him as their initiation fees and dues; that he was a representative of Division 1055 of the Amalgamated Association and was there for the purpose of discussing the collective bargaining agreement for all drivers of the company.

February 2, 1939, at a special meeting of the members of the association, a motion was made and seconded "that the Can-Ada Bus Drivers Association cancel its present contract or agreement with the Boise Street Car Company." The vote was by secret ballot and the motion was carried by a majority of fifteen to four. Turner received notice of the action of the association, canceling the contract, the same day. The association was dissolved during the latter part of the same month.

After the contract was canceled, employing and discharging drivers was again the duty and responsibility of the company. Between February 6, and March 15, 1939, eight drivers were discharged. The company's manager testified they were discharged for the following causes: "Two for careless and incompetent operation of equipment; two for inexcusable accidents; one for drunkenness; one for drinking and other infractions of the rules; one for appropriating company money for his own use, only; and one for appropriating company money for his own use and other objections." This testimony is not disputed, nor is it denied that the discharged employees were guilty of the misconduct attributed to them.

Shortly after the conference between Turner and Mumbach the latter returned to Portland and C. W. Van Avery, vice-president of the Amalgamated Association, and president of Local Division No. 1055 thereof, appeared on the scene. He had conferences with Turner with respect to discharging eight employees of the company and an effort was made to submit the question, as to whether their discharge was justifiable, to arbitration. Van Avery refused to arbitrate unless the discharged men were first reinstated. The strike occurred early in the morning of March 30th. It was authorized by vote of fourteen of the drivers, including the eight who had been discharged.

As a means of putting economic pressure on respondent, and for the purpose of so injuring its business as to bring it to terms, the strikers, under direction of the strike committee, and with the aid and assistance of other appellants who cooperated with them, operated what is referred to in the record as ''courtesy cars.'' These cars are ordinary passenger automobiles on which signs were placed indicating they were being operated between the same points as were respondent's buses. They were operated over the same routes as were the buses and at a distance in advance of them to make it convenient for the company's patrons to use the ''courtesy cars'' instead of the buses. The operators of the ''courtesy cars'' collected no fares, but had receptacles for money in convenient places in the cars for contributions to be made by passengers who were inclined to contribute. The money thus raised was used in paying the expenses of operating the cars and any deficit existing was made up by contribution by the Amalgamated Association. The testimony shows respondent's revenues were diminished by the operation of the ''courtesy cars'' from $70 to $75 per day during the time they were in use.

 ██ Damages for such an injury may be recovered. In an action to recover damages for loss of anticipated profits, occasioned by tortious interference with an established business, proof of the amount and cause of such loss, with reasonable certainty, is sufficient. (*Community Public Service Co. v. Gray,* (Tex. Civ. App.) 107 S. W. (2d) 495; *Texas & P. Ry. Co. v. Mercer,* (Tex. Civ. App.) 58 S. W. (2d) 896; *City of Corning v. Iowa-Nebraska Light & Power Co.,* 225 Iowa, 1380, 282 N. W. 791; *Krikorian v. Dailey,* 171 Va. 16, 197 S. E. 442.) Issues of fact, in civil cases, are to be decided in accordance with the preponderance of evidence and reasonable probability of truth. (*Adams v. Bunker Hill etc. Min. Co.* (on rehearing), 12 Ida. 643, 89 Pac. 626, 11 L. R. A., N. S., 849; *Newman v. Great Shoshone etc. Power Co.,* 28 Ida. 764, 156 Pac. 111; *Roe v. Boise Grocery Co.,* 53 Ida. 82, 21 Pac. (2d) 910; *Watkins v. Federal Life Ins. Co.,* 54 Ida. 174, 29 Pac. (2d) 1007; *Pierstorff v. Gray's Auto Shop,* 58

Ida. 438, 74 Pac. (2d) 171; *Manion v. Waybright*, 59 Ida. 643, 86 Pac. (2d) 181.)

Appellants insist the association was not a labor union, in the true sense of the word, but was under the domination of the company; that the company, by interfering with its employees' statutory right of self-organization, violated the law and is in court with unclean hands. The principal incident relied on to sustain this contention is that before the association was organized some of the drivers had a talk with the company's manager with respect to it. He suggested if they desired assistance in drafting their articles they might, without expense, procure the services of the company's attorney. They went to the attorney for this assistance, and nothing in the record indicates he was unfaithful to them in performance of his duty. The papers he prepared show his work was fairly and efficiently done and strictly in the interest of the association. Appellants' contention is without merit.

It is not to the best interest of either employer or employee that their attitude toward each other be antagonistic. Friendly cooperation between them is commendable. If the manager had offered the services of the company's attorney, to assist its employees in perfecting their organization, for the purpose of having the work so done as to be to their disadvantage and to the advantage of the company his conduct would have been reprehensible, indeed. There is no evidence to support such a theory. If the attorney had, in any manner, imposed upon the employees and placed something in their articles of association which would operate to their disadvantage, we would condemn such a practice. However, before condemnation, proof that a reputable member of the bar, as the company's attorney was and is, has been guilty of such gross misconduct is necessary. A suggestion that he had an opportunity to do so is not sufficient.

Another incident, relied on by appellants to show that the association was not a legitimate labor union, organized and operated in the interest of its members, is that at one of the meetings a member, Mr. Akard, made a motion for an increase of wages, which was seconded and was not put to a vote.

With respect to that incident Henry Koll, who was president of the association at the time, testified:

Q. "Tell us what you remember about what took place at that time.

A. "I heard about it—that the motion was seconded by somebody, and I asked Mr. Akard about it, and I says, 'I took it for a joke,' and he says, 'It was a joke.'

Q. "That was at the next meeting of the association?

A. "Yes.

" . . . .

Q. "Did anyone make a motion at that meeting to bring that matter up?

A. "At the next meeting?

Q. "Yes.

A. "No, sir."

That testimony is not contradicted.

 The judge found no labor dispute existed. That is true as to the relations between the company and its employees during the time the association continued. After the contract between the association and the company was canceled the discharging of eight of the employees, and the strike which resulted therefrom, constituted a labor dispute within the meaning of 1933 Session Laws, chapter 215, section 12 (c), as follows:

"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, or concerning employment relations, or any other controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

Section 6 of that chapter also has a bearing on this case. It provides:

"No court nor any judge or judges thereof shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as herein defined, except after hearing the testimony of witnesses in

open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of all the following facts by the court or judge or judges thereof;''

Then follows a list of facts necessary to be found, designated (a), (b), (c), (d), (e), and (f). That section was complied with by making the findings of fact, necessary to be found, as specified. Subsection (f) is as follows:

''That the public officers charged with the duty to protect complainant's property have failed or are unable to furnish adequate protection.''

Following the specification of facts to be found, the section provides:

''Such hearing shall be held after due and personal notice thereof has been given, in such manner as the court shall direct, to all known persons against whom relief is sought, and also to those public officers charged with the duty to protect complainant's property: . . . . ''

The complaint contains no allegation that the public officers, charged with the duty to protect complainant's property, failed, or were unable, to furnish adequate protection, and appellants argue that it does not state facts sufficient to constitute grounds for injunction and that the district court was without jurisdiction to grant injunctive relief.

The complaint states a cause of action against appellants for operating the ''courtesy cars'' in violation of the laws of the City of Boise and respondent's franchise rights. Respondent did not state, nor attempt to state, a cause of action involving a labor dispute. Allegations of the existence of a labor dispute appear, as new matter, in the answer. These allegations, according to our practice, are deemed denied (I. C. A., sec. 5–812). Our practice does not provide for replication.

The absence of an allegation in the complaint that the public officers, charged with the duty to protect respondent's property, failed or were unable to do so, did not deprive the court of jurisdiction to grant injunctive relief from the operation of the ''courtesy cars.''

The record does not show that the public officers charged with the duty to protect the company's property were given notice of, or were present at, the trial. Even if they were not notified the omission is not prejudicial. They had no interest in the controversy, and it is not apparent they could have been of benefit to any party litigant had they been present at the trial. Neither party appears to have suffered any disadvantage on account of their absence.

 An error or defect in the pleadings or proceedings, which does not affect the substantial rights of the parties, cannot be made the basis of reversal of a judgment or decree. (I. C. A., sec. 5–907; *Chaney v. Village of Middleton*, 58 Ida. 289, 293, 72 Pac. (2d) 850, 851, and cases therein cited.)

 The trial resulted in a judgment in favor of the company and against appellants for damages in the sum of $2,310, together with interest thereon and costs; also in a decree perpetually enjoining appellants from

*"doing, or attempting to do, any of the following described acts, with intent or purpose of intimidating the employees of the plaintiff so as to prevent them from continuing in said employment, or with intention or purpose of intimidating persons intending to, or about to enter such employment so as to prevent them from becoming such employees, to wit: Stationing or placing, or causing to be stationed or placed on the street or elsewhere at or near the plaintiff's place of business, or along the streets and alleys of Boise City, and territory contiguous thereto over which the plaintiff company operates its passenger carrying vehicles under and by virtue of a franchise from Boise City, Idaho, any picket or pickets, with a placard or transparency having on it the words and figures indicating that the plaintiff is unfair to organized labor, or having words or figures of similar import, and from that said place of business, or in front thereof, or along the streets and alleys, as heretofore referred to, by means of pickets, or transparencies, or otherwise, threatening or intimidating or influencing through fear of injury· to its own business, any person or persons, transacting or desiring to*

*transact business with said plaintiff, or making use of its transportation service, or being employed by said plaintiff.*

*"The aforesaid defendants are also enjoined from and commanded to desist and refrain from interfering, or attempting to interfere in any manner with the free use, occupation and enjoyment by the plaintiff, its agents, officers, servants, and employees of any kind or nature, or hindering or obstructing, or attempting to hinder or obstruct, in any manner the plaintiff's business or any part thereof; or molesting, or interfering with, or intimidating, or harrassing any employee of plaintiff, or person who seeks to enter the employment of plaintiff, or using any force or violence of any kind, or nature, or threatening, or attempting to use such force or violence against any employee of plaintiff, or any person who seeks such employment with the design to intimidate, or coerce them so as to prevent them from remaining, or becoming such employees.*

"The aforesaid defendants are also enjoined from and commanded to desist and refrain from operating any motor vehicles along the streets and alleys of Boise City and territory contiguous thereto, over which the plaintiff has the franchise right to transport passengers, with intent to, or in such manner as to interfere with the full and free enjoyment of its right by the plaintiff, and especially to stop the operation of the so-called 'courtesy cars' or any motor vehicles operated in a similar manner so as to directly or indirectly interfere with the transportation business of the plaintiff.

"The aforesaid defendants are also enjoined from and commanded to desist and refrain from interfering, or attempting to interfere in any manner with the free use of their motor vehicles and other personal property used in connection with the plaintiff's business or in carrying on said business and enjoined from doing any acts or things whatever in furtherance of any conspiracy or confederation among them, or any of them, to obstruct or interfere with said plaintiff, its officers, agents or employees, in the free and unrestrained control and operation of its business and property, and also from ordering, directing, aiding, assisting, or in any manner abetting any person committing any or either of the acts aforesaid.''

 Session Laws 1933, chapter 215, section 8, provides: "No restraining order or temporary or permanent injunction shall be granted in a case involving or growing out of a labor dispute, except on the basis of findings of fact made and filed by the court in the record of the case prior to the issuance of such restraining order or injunction; and every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case and expressly included in said findings of fact made and filed by the court as provided herein; and shall be binding only upon the parties to the suit, their agents, servants, employees and attorneys, or those in active concert and participation with them, and who shall by personal service or otherwise have received actual notice of the same."

No reference is made in the complaint, or findings, to picketing or acts of violence, or threatened violence, or intimidation, and there is no evidence to support the portions of the decree relating thereto. The inclusion in the decree of the portions printed in italics is erroneous.

 The portions of the decree relating to the operation of "courtesy cars" are supported by the complaint and findings and are sustained by the evidence. The use of these cars, in the manner and for the purpose they were used, and in and for which appellants threaten to continue to use them unless restrained from so doing, violates the law and is an invasion of the company's franchise rights and justifies the granting of injunctive relief. (23 Am. Jur. 745, sec. 39; 26 C. J. 1047, sec. 126.)

For the purpose of giving publicity to, or communicating information of, the facts involved in the labor dispute, appellants had a right to patrol the public streets of the city of Boise with automobiles carrying placards, transparencies or banners, but they could not engage in the business of carrying passengers, as in the case at bar, because they had no franchise and had not complied with the requirements of I. C. A., section 59-806. However, the injunction must not be so construed as to prohibit or otherwise interfere with ap-

pellants' lawful use of the streets for the purpose of giving publicity to, or communicating information of, the facts involved in their dispute.

Appellants assert that defendants, Paul Bennett, Steve Sabin, Cecil B. Howell, Willard D. Bell, Owyhee Cab Company, Al E. Knapton, W. R. Stoddard and Beulah McIntire were not shown to have participated with the other defendants, nor to have assisted them, in furtherance of the acts charged in the complaint. This contention appears to be well founded. However, neither Howell nor Stoddard is included in the judgment and decree. The only testimony tending to show that the other defendants named participated in the acts complained of is that of Mr. Turner, as follows:

Q. "Now, Mr. Turner, it is alleged in the complaint that certain cars have been operating as 'courtesy cars' and certain individuals driving them. Have you made a check-up of the ownership of those cars?

A. "Yes, sir.

Q. "And did that with the law enforcement department of this state?

A. "Yes, sir.

Q. "And with the proper authorities of the State of Oregon?

A. "Yes, sir.

Q. "And based upon that check-up and information thus secured, are the ownerships as listed in Paragraph II of this complaint?

A. "Yes, sir.

Q. "You went over that with your attorney and know that that is correct?

A. "Yes, sir.

Q. "And as to the drivers of those cars, do you know that the men listed in Paragraph II did drive those cars?

A. "Yes, sir.

Q. "You checked that matter?

A. "Yes, sir.

Q. "And was a re-check of that made since April 18th?

A. "Yes, sir.

Q. "And are all of the cars, or have all of those cars been in that service since April 18th?

A. "No, sir.

Q. "Do you have a list of those that were not, or can you give us those that were not?

A. "I can, but not now.

Q. "You could supply it later on?

A. "Yes, sir."

That testimony is based on hearsay and is not proof of the facts sought to be established by it. The names were erroneously included in the judgment and decree.

Respondent concedes Ralph Roth, named in the complaint as a defendant, was not served with summons nor order to show cause, and did not appear, by attorney or otherwise. It was error to include him in the judgment and decree.

The case is remanded to the district court with direction to modify the decree by eliminating therefrom the names of Ralph Roth, Paul Bennett, Steve Sabin, Willard D. Bell, Owyhee Cab Company, Al E. Knapton and Beulah McIntire, and by eliminating therefrom those portions appearing in italics in this opinion. So modified, the decree is affirmed.

 Justice Givens and I believe the judgment for damages should be affirmed. The majority of the court holds the judgment for damages should be reversed and a new trial granted. It is, therefore, so ordered. No costs awarded.

Givens, J., concurs.

HOLDEN, J., Dissenting in Part and Concurring in Part.— In the enactment of chapter 215, 1933 Session Laws, page 452, the legislature declared the public policy of the state of Idaho regarding labor organizations and employer's organizations. Section 1 of the statute provides:

"In the interpretation and application of this Act, the public policy of this state is declared as follows:

"Negotiations of terms and conditions of labor should result from voluntary agreement between employer and employees. Governmental authority has permitted and encouraged employers to organize in the corporate and other forms of capital control. In dealing with such employers the individual unorganized worker is helpless to exercise actual

liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment. Therefore it is necessary that the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of employment, and that he shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.''

Section 6 provides:

''No court nor any judge or judges thereof shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as herein defined, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of all the following facts by the court or judge or judges thereof;

(a) ........
(b) ........
(c) ........
(d) ........
(e) ........
(f) That the public officers charged with the duty to protect complainant's property have failed or are unable to furnish adequate protection.
. . . . ''

The Norris-LaGuardia Anti-Injunction Act (Title 29, U. S. C. A., approved by President Herbert Hoover March 23, 1932), is substantially the same as the Idaho statute (chap. 215, *supra*). Section 107 (Norris-LaGuardia Anti-Injunction Act, *supra*), provides:

''No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as herein defined, except after hearing the testimony of witnesses in open court

(with opportunity for cross examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court to the effect—

 (a) ........
 (b) ........
 (c) ........
 (d) ........
 (e) ........
 (f) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

 . . . . "

The above-quoted provisions of the Idaho and federal statutes are identical in purpose and intent.

In the case at bar respondent Boise Street Car Company did not allege nor prove the public officers charged with the duty to protect its property had failed or were unable to furnish adequate protection.

While this court has not construed the above-quoted provisions of the Idaho statutes (chap. 215, *supra*), the federal courts have passed upon identical provisions of the Norris-LaGuardia Act, *supra*. In *Grace Co. v. Williams et al.*, 96 Fed. (2d) 478 (C. C. A., 8th Cir.), it was held an employer's complaint (seeking an injunction to restrain labor union representatives from picketing, intimidating employees, destroying property, and otherwise interfering with employer's business and with relationship between employer and another union organized by majority of employees), was dismissible where it failed to allege facts necessary to be found under the Norris-LaGuardia Act precedent to granting of an injunction in cases involving labor disputes, *including inability or unwillingness of officers to protect complainant's property.*

In *Heintz Mfg. Co. v. Local No. 515 of United Automobile Workers*, 20 Fed. Supp. 116, the court held the statute (Title 29, U. S. C. A., *supra*) restricting a federal court's jurisdiction of injunction cases arising out of labor disputes, is intended to abolish jurisdiction of the courts *except* where police authorities fail or refuse to act, since preservation of order

and protection of property are primarily police and executive, rather than judicial problems.

The United States Circuit Court of Appeals, Third Circuit (*Wilson & Co. v. Birl,* 105 Fed. (2d) 948), held the provisions of the Norris-LaGuardia Act, under which injunctive relief to an employer is authorized if public officers charged with the duty to protect employer's property are either unable or unwilling to furnish adequate protection, permits the court to grant an injunction *only where the police cannot or will not do their duty of protecting the physical property of the employer.* (See, also, *Knapp-Monarch Co. v. Anderson,* 7 Fed. Supp. 332, cited with approval.)

And the United States Circuit Court of Appeals, Ninth Circuit (*International Brotherhood of Teamsters, etc., v. International Union of United Brewery, etc.,* 106 Fed. (2d) 871, 877), held:

"Since the acts enjoined were committed in the course of and for the purposes of furthering the Teamsters' aims in a labor dispute as defined in the Norris-LaGuardia Act, it was beyond the power of the court to enjoin any of them, so far as they are lawful. Insofar as the acts are found to be unlawful, the Norris-LaGuardia Act permits injunctive relief only if it be shown, *inter alia,* that 'the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.' (Sec. 7 (e), Stats. 71, 29 U. S. C. A., section 107 (e)."

"Neither the pleadings nor findings mention the public officers, much less any inability or unwillingness on their part to furnish such protection."

In *National Labor Relations Board v. Jones & Laughlin Steel Corp.* (1937), 301 U. S. 1, 57 Sup. Ct. 615, 622, 81 L. ed. 893, 108 A. L. R. 1352, Chief Justice Charles E. Hughes said:

"Employees have as clear a right to organize and select their representatives for lawful purposes as the respondent has to organize its business and select its own officers and agents. Discrimination and coercion to prevent the free exercise of the right of employees to self-organization and representation is a proper subject for condemnation by competent

legislative authority. Long ago we stated the reason for labor organizations. We said that they were organized out of the necessities of the situation; that a single employee was helpless in dealing with an employer; that he was dependent ordinarily on his daily wage for the maintenance of himself and family; that, if the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and resist arbitrary and unfair treatment; that union was essential to give laborers opportunity to deal on an equality with their employer. *American Steel Foundries v. Tri-City Central Trades Council*, 257 U. S. 184, 209, 42 S. Ct. 72, 78, 66 L. Ed. 189, 27 A. L. R. 360. We reiterated these views when we had under consideration the Railway Labor Act of 1926, 44 Stat. 577. Fully recognizing the legality of collective action on the part of employees in order to safeguard their proper interests, we said that Congress was not required to ignore this right but could safeguard it. Congress could seek to make appropriate collective action of employees an instrument of peace rather than of strike. We said that such collective action would be a mockery if representation were made futile by interference with freedom of choice. Hence the prohibition by Congress of interference with the selection of representatives for the purpose of negotiation and conference between employers and employees, 'instead of being an invasion of the constitutional right of either, was based on the recognition of the rights of both.' "

On the question of damages it was testified by respondent's manager in response to an inquiry as to what damages the company suffered by reason of the operation of ''courtesy cars'':

''Well, in several ways. The first way, of course, the major way, is in the loss of revenue as we have actually experienced it to date. The other that is to be done, that we can expect hereafter, assuming a settlement was made today, is by passengers who otherwise would have been customers having made transportation available to them for the rest of the year; in other words, people who buy automobiles to take care of their transportation problems because to ride the bus may be directly or indirectly to that man injurious to them in their

business, and the "Courtesy Cars" were unable to give them the service they are after. We are compelled to suffer additional expense that we thought we were compelled to incur in the face of this particular action, and financial loss making it impossible to make our payments as required by contract endangers the whole thing by a possible loss of the busses."

It will be noted respondent's manager testified the company experienced a loss of revenue due to those who purchased "automobiles to take care of their transportation problems." In addition to that, there is testimony to the effect union men would have refused to ride in the busses even though no "Courtesy Cars" had been provided. It is well settled where damages result from independent causes as well as from the acts of the defendants, plaintiff must show what portion of the damages sustained are attributable to defendant's acts, since defendant cannot be held liable for the total damage. (*First Nat. Bank v. Peterson,* 47 Ida. 794, 803, 279 Pac. 302; *Wade v. Thorsen,* 5 Cal. App. (2d) 706, 43 Pac. (2d) 592, 595; *Priest v. Nichols,* 116 Mass. 401; *Lemley v. Golden Censer Co.,* 16 Ill. App. 457.) Undoubtedly respondent Boise Street Car Company is entitled to recover whatever damages (in the form of anticipated profits) it can prove with reasonable certainty it sustained because of the operation of the "Courtesy Cars" by appellants (*City of Corning v. Iowa-Nebraska Light & Power Co.,* 225 Iowa, 1380, 282 N. W. 791, 796; *Krikorian v. Dailey,* 171 Va. 16, 197 S. E. 442), but where, as here, the evidence shows damages resulting from the operation of "Courtesy Cars" as well as from the above-mentioned independent causes, respondent must show (which it failed to do) what portion of the damages is attributable to the acts of appellants, for instance, by the operation of the "Courtesy Cars." Furthermore, there is no proof as to whether, prior to the operation of the "Courtesy Cars," respondent made a daily (or any) profit, and if so, how much. Hence, there was nothing upon which to base a recovery of anticipated profits.

As pointed out in the majority opinion, "after the contract between the Association and the Company was cancelled, the discharging of eight of the employees, and the strike which

resulted therefrom, constituted a labor dispute within the meaning of Chapter 215, *supra*." And as also pointed out, "no reference is made in the complaint, or findings, to picketing or acts of violence, or threatened violence, or intimidation, and there is no evidence to support the portions of the decree relating thereto. The inclusion in the decree of the portions printed in italics is erroneous," and some of the portions printed in italics are erroneous for the further reason it was not alleged nor proven the public officers charged with the duty to protect respondent had failed or were unable to furnish adequate protection.

Appellants Paul Bennett, Steve Sabin, Cecil B. Howell, Willard D. Bell, Owyhee Cab Company, Al E. Knapton, W. R. Stoddard, Beulah McIntire, as well as appellant Ralph Roth (the latter not having been served with process) were erroneously included in the judgment and decree.

I concur with Mr. Justice Morgan in holding that "for the purpose of giving publicity to, or communicating information of, the facts involved in the labor dispute, appellants had a right to patrol the public streets of the city of Boise with automobiles carrying placards, transparencies or banners, but they could not engage in the business of carrying passengers, as in the case at bar, because they had no franchise and had not complied with the requirements of I. C. A., section 59–806. However, the injunction must not be so construed as to prohibit or otherwise interfere with appellants' lawful use of the streets for the purpose of giving publicity to, or communicating information of, the facts involved in their dispute."

For the reasons herein stated the judgment for damages should be reversed and the cause remanded to the trial court with directions to grant a new trial, and costs should be awarded to appellants.

AILSHIE, C. J.—I think the entire injunction order, as written, should be reversed, including the portion approved by the majority opinion and reading as follows:

"The aforesaid defendants are also enjoined from and commanded to desist and refrain from operating any motor ve-

hicles along the streets and alleys of Boise City and territory contiguous thereto, over which the plaintiff has the franchise right to transport passengers, with intent to, or in such manner as to interfere with the full and free enjoyment of its right by the plaintiff, and especially to stop the operation of the so-called 'courtesy cars' or any motor vehicles operated in a similar manner so as to directly or indirectly interfere with the transportation business of the plaintiff.

''The aforesaid defendants are also enjoined from and commanded to desist and refrain from interfering, or attempting to interfere in any manner with the free use of their motor vehicles and other personal property used in connection with the plaintiff's business or in carrying on said business and enjoined from doing any acts or things whatever in furtherance of any conspiracy or confederation among them, or any of them, to obstruct or interfere with said plaintiff, its officers, agents or employees, in the free and unrestrained control and operation of its business and property, and also from ordering, directing, aiding, assisting, or in any manner abetting any person committing any or either of the acts aforesaid.''

My analysis of the foregoing portion of the injunction convinces me that it is entirely too broad in its prohibition against the appellants ''operating any motor vehicles along the streets and alleys of Boise City and territory contiguous thereto, over which the plaintiff has the franchise right to transport passengers, . . . . '' Of course if they operated their cars along the streets in front of respondent's motor buses, regularly and continuously, it was evidently done ''with intent . . . . to interfere with the full and free enjoyment of'' respondent's rights. On the other hand, these are some of the very things that the statute seems to authorize members of the labor union to do. Section 3, chapter 215, 1933 Session Laws, provides *inter alia* as follows:

''No court, nor any judge or judges thereof shall have jurisdiction to issue any restraining order or temporary or permanent injunction which in specific or general terms prohibits any person or persons from doing, whether singly or in concert any of the following acts: . . . .

"(e) Giving publicity to and obtaining or communicating information regarding the existence of, or the facts involved in, any dispute, whether by advertising, speaking, patrolling any public street or any place where any person or persons may lawfully be, without intimidation or coercion, or by any other method not involving fraud, violence, breach of the peace, or threat thereof;"

It will be observed from the foregoing excerpts from the statute, that "patrolling any public street or any place where any person or persons may lawfully be," is authorized; and subdivision (i) of the same section authorizes

"(i) Agreeing with other persons to do or not to do any of the acts heretofore specified";
while subdivision (k) of the same section legalizes the doing of any or all of the acts enumerated "in concert."

The cases, both state and federal, seem to abundantly support and uphold members of a labor union in doing any and all of the things enumerated in this statute.

The "operation of the so-called 'courtesy cars'" along the streets preceding respondent's motor buses in a peaceful and orderly manner, was within the rights of the appellants; and they might do so with or without signs or notices by simply orally publicizing their purpose or the controversy between them and the transportation company. The intent with which they do so is immaterial. (*New Negro Alliance v. Sanitary Grocery Co., Inc.*, 303 U. S. 552, 58 Sup. Ct. 703, 82 L. ed. 1012.)

I am agreed, however, with that part of the majority opinion which, as I understand it, holds to the effect that appellants exceeded their right of picketing and patrolling streets and the right of freedom and liberty of expression, when they, inferentially solicited, and accepted respondent's passengers or prospective passengers who had assembled at the company's stations and stopping places and carried them over the same transportation routes on which respondent was operating its passenger buses. They also exceeded their right of picketing and patrolling, when they received or accepted donations or contributions for carrying such passengers. The unlawful acts hereinabove pointed out may well be enjoined.

Under the facts of this case, the judgment for such damages as were awarded is not supported by legal or substantial evidence. *The entire judgment should be reversed.*

I am authorized to say that Justice Budge concurs in these views.