# Illinois Central Railroad Company v. River & Rail Coal & Coke Company.

## Same v. Same.

(Decided November 12, 1912.)

## Appeals from Union Circuit Court.

1. Railroads—Duty in Furnishing Cars to Shippers.—A railroad company is under a legal duty to maintain sufficient cars and equipment to meet the normal demands of the traffic, and to be able to furnish to shippers, when seasonably requested, the number of cars needed. If it fails in this respect it may be required to respond in damages to any shipper who has suffered loss thereby, but is not liable in case there is an unprecedented and unexpected press of business that could not be anticipated.

2. Railroads—Duty in Furnishing Cars to Coal Mines.—A railroad company cannot discriminate against or show any preference to any coal mines on its line of road but it must treat all alike: It must also supply itself with a sufficient number of cars to meet the normal demands of the coal trade during the fall and winter months when this trade is the heaviest. The fact that a railroad company may have an adequate supply of cars to meet the demands of the trade if it was equally distributed during all the months in the year, does not fulfill its duty. It must have a sufficient supply to meet the demands of the trade during the busy months, although its supply may be greatly more than is needed during the slack months.

3. Railroads—Duty in Furnishing Cars to Coal Mines—Instructions —Measure of Damage.—The measure of damage that may be recovered from a railroad company for its failure to furnish cars to a coal mine is the reasonable difference in what it actually costs to mine and place the coal on the market less the value of the coal in the ground, and what the coal that could have been mined would reasonably sell for on the market, and in addition the actual expense incurred and wages paid out and other expenses necessarily incurred during the time the mine was idle on account of the failure to obtain cars.

4. New Trial—Petition to Obtain on Ground of Newly Discovered Evidence.—When a new trial is sought, under section 344 of the Code it must appear from the petition that the ground upon which it was asked was not discovered until after the expiration of the term at which the trial was had. If the ground is discovered during the term the application for a new trial must be made in the manner pointed out by sections 340 and 343 of the Code.

TRABUE, DOOLAN & COX, C. L. SIVLEY, D. H. HUGHES, and ALLEN & MILLER for appellant.

DRURY & DRURY for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

One of these appeals is prosecuted from a judgment for $200, rendered by the Union Circuit Court against the appellant and in favor of appellee; the other appeal is from a judgment of the same court dismissing a petition seeking a new trial in the case in which the judgment was rendered. As the appeal in which the judgment was rendered is the more important of the two we will dispose of it first.

The River & Rail Coal & Coke Co. is a corporation engaged in mining coal in Union County, and its mine is located on a line of railway controlled and operated by the appellant railroad company. This suit was brought by the coal company to recover damages for the failure of the railroad company to furnish it cars for the transportation of coal produced at its mine. It was averred in the petition that on several named days in October, 1910, the railroad company failed to furnish it any cars in which to load coal, although the railroad company was given timely and sufficient notice of the number of cars that would be needed on those days. It was further averred that by reason of the failure to furnish the cars ordered, or any cars, on the days mentioned, operations at the mine had to be suspended, thereby incurring considerable expense in the payment of unemployed labor and causing the coal company to suffer loss in other respects that are pointed out more in detail in the instructions that will be later noticed, for all of which it sought to recover damages.

The case for the coal company is not put upon the ground that the railroad company in failing to furnish it cars was discriminating against it or showing a preference to other coal mines or shippers, but the right of recovery is rested upon the ground that the railroad company did not have a legally adequate or sufficient number of coal cars to supply the demands of the trade, and in so failing committed a breach of duty for which it was amenable in damages.

In its defense the railroad company did not deny that it failed to furnish the cars or dispute that reasonable and proper demand for them had been made, but sought to excuse its failure upon the ground that, although it had an adequate supply of coal cars, the demand for this class of cars was so great in October, 1910, that it could not furnish the cars requested with-

out discriminating against other coal mines on its line of road and showing a preference to the appellee coal company. Several issues are raised by the pleadings, but the real question in the case is: What is the legal measure of duty that a railroad company owes to the operators of coal mines in respect to furnishing them cars for the transportation of coal?

In view of the fact that coal is an indispensable necessity in the domestic as well as the commercial life of the country, and that the supply must, in a large part, be transported from the mines to the consumer by railroad, it can at once be seen that the question before us is important not only to mine owners and railroad companies but to the coal consuming population that may be affected by the decision. In truth the mine owners and the coal consuming public are more directly interested in questions like this than the railroad companies, because the railroad companies might operate and prosper without the carriage of coal, while the property of the mine owner would be worth little or nothing unless he could find a way to market for his product, and a scarce or insufficient supply of cars in the market greatly increases the price to the consumer. In view of this condition it is apparent that railroad companies have it in their power, by failing to furnish an adequate number of cars for the transportation of coal, to not only injure or destroy the property of the mine owner, but to largely increase the price of coal to the consumer by failing to put on the market the amount of coal necessary to meet the demands of the trade. So that if we should put out of view the interest of the mine owner, it is manifest that the good of the public demands that railroads engaged in the coal carrying trade should be held to as strict a performance of their legal duty in the transportation of coal as is consistent with law and fairness. With these few preliminary observations we will now endeavor to point out what the legal duty of a common carrier engaged in the transportation of coal is.

At common law the carrier was bound to provide reasonable facilities and appliances to transport such goods as it held itself out ready to carry. Newport News Co. v. Mercer & Warfield, 96 Ky., 475; L. & N. R. R. Co. v. Queen City Coal Co., 99 Ky., 217. And this common law duty has been incorporated into both the

State and Federal Statutes. Thus section 783, of the Kentucky Statutes, which treats of the duties of railroad companies in furnishing adequate facilities for the transportation of freight, provides that "every company shall furnish sufficient accommodations for the transportation of all such passengers and property as shall within a reasonable time previous thereto offer or be offered for transportation at places established by the corporation for receiving and discharging passengers and freight." In section one of the Act of Congress relating to Interstate Commerce it is provided that "The term 'transportation' shall include cars and other vehicles and all instrumentalities and facilities of shipment or carriage. * * * And it shall be the duty of every carrier, subject to the provisions of this act, to provide and furnish such transportation upon reasonable request therefor, and to establish through routes and adjust reasonable rates applicable thereto."

It will thus be seen that under the common law, as well as the State and Federal Statutes, which are merely declaratory thereof, a common carrier is under a legal duty, subject to exceptions some of which will be noticed, not only to provide itself with but to furnish to shippers, when seasonably requested, sufficient cars and equipment to carry all of the freight that may be offered to it and that it holds itself out as a carrier of. Or as admirably stated in Hutchinson on Carriers, section 495, "The first duty of the common carrier who holds himself out to the public as ready to engage in the carrying business is of course to provide himself with reasonable facilities and appliances for the transportation of such goods as he holds himself out as ready to undertake to carry. He must put himself in a situation to be at least able to transport an amount of freight of the kind which he proposes to carry equal to that which may be ordinarily expected to seek transportation upon his route, for while the law will sometimes excuse him for delay in the transportation and even for a refusal to accept the goods which may be offered for carriage when there occurs an unprecedented and unexpected press of business, it will not do so when his failure or refusal results from his not having provided himself with the means of present transportation for all who may apply in the regular and expected course of business."

The duty thus imposed upon common carriers and especially railroads, they should be required to fully perform except when relieved by extraordinary conditions that render such performance impracticable, and for the failure to perform this duty it is well settled that the carrier is liable in damages to the shipper who has suffered injury in consequence thereof. One of the causes that will exempt the carrier from the full performance of its legal duty in respect to furnishing facilities for the carriage of freight is the existence of a strike that prevents it from handling the business that it had fully equipped itself to handle, and another arises when there is such an unprecedented and unusual demand on its equipment and capacity that it could not reasonably be expected to anticipate or prepare for it. 5 Am. & Eng. Ency. of Law, 167; 6 Cyc., 372; Hutchinson on Carriers, section 496.

But neither of these exceptions exist in this case, although the railroad company attempts to excuse itself in part at least for the failure to furnish the requested cars upon the ground that a strike upon another part of its road interfered with the distribution of its equipment and prevented it, at the time in controversy, from supplying the demand for cars. The evidence, however, upon this point was not sufficient to show that the existence of the strike had any material bearing upon its failure to supply the cars requested. Nor is there any showing that there was such an unprecedented and unusual demand on its equipment and capacity that it could not reasonably be expected to anticipate or prepare for it. The demand was not more than the company should reasonably have anticipated and prepared to meet at the season of the year when this controversy arose. In fact railroad companies have such ample means of ascertaining in advance the number of cars that each mine on the road will need during the year or during the busy season that it would be a very exceptional state of affairs when they could not anticipate and prepare to meet the demands of the trade. There is indeed less probability of an unprecedented and unusual demand for cars arising in the carriage of coal than might occur with respect to other commodities, for with the facilities afforded for rating the capacity of mines and the fact that the quantity of coal to be mined, although gradually increasing, is generally fairly well

known in advance, the coal carrying business is perhaps subject to fewer fluctuations than arise for example in the transportation of grain, cattle and cotton. But in view of the fact that the real defense relied on is that the company had a sufficient supply of cars and equipment to meet the demands of the trade, it does not seem necessary that we should notice with further particularity the features of the case relating to the strike or the unusual demand on its equipment. Whether the company had or not such facilities as were legally sufficient depends in a large measure on the soundness of its interpretation of the measure of its legal duty in providing itself with equipment and furnishing the same to shippers.

The appellant is one of the largest railroad companies in the United States. Its tracks cover thousands of miles and traverse a number of States. On its lines of road in at least three States there are situated many coal mines in active operation, and to handle the coal trade it had, in 1910, supplied itself with some 23,000 coal cars, and it contends that this number of cars was adequate to supply the demand, insisting, however, that the number of cars required to fulfill its duty did not impose upon it the obligation to have on hand the number needed to meet the full demands of the trade during the fall and winter months when the movement of coal is many times larger than it is in the spring and summer months. In other words, as we understand the position taken by counsel, it is this; that if a railroad company has a sufficient supply of cars to meet the demands of the coal carrying trade during the year, assuming that approximately the same amount of coal will be shipped during each month, it has fulfilled its legal duty, although the car supply may be wholly inadequate to meet the demands of the trade during the winter and fall months. But we do not agree with counsel that this is a fair or reasonable interpretation of the legal duty of a railroad company engaged in the coal carrying trade from mines along its line of road. For although a railroad company might maintain a sufficient number of cars to carry the coal offered, if the same quantity approximately was offered each month in the year, it might fall far short of having a sufficient number to meet the demands of the trade during the fall and winter, because during this season for at least six months many more

cars are needed than are required in the other six months. If the slack as well as the busy months of the year are to be taken into consideration in estimating the equipment needed the supply of cars might be wholly inadequate during the busy months, and yet there would be a large surplus during the slack months. This difference between the movement of coal in the fall and winter and the spring and summer is a matter of such common and general knowledge that railroad companies will not be allowed to plead ignorance of this well known condition, or with knowledge of it, to excuse their lack of car facilities upon the ground that if approximately the same quantity of coal was shipped and used each month in the year their car facilities would be ample to meet the demand. Nor does the well recognized principle that appellee was only required to have a sufficient supply of cars to meet the normal demands of the trade help its defense because it did not have in our opinion such a supply. For conceding that a carrier is only required to have a car supply adequate to meet the normal demands of the trade, this normal demand is not to be estimated by the number of cars needed when the normal demand is least but by the number needed when the normal demand is the heaviest, in respect to a commodity such as coal, the normal demand for which is practically the same during six or eight months in each year. And while the number needed in each of these busy months may be taken into consideration in estimating the number needed to supply the demand during all these months, the number needed to supply the demand during the spring and summer months is entitled to little consideration in determining what number of cars is needed to supply the normal demand. Of course a railroad company cannot tell with exact certainty the number of cars that may be needed to meet, in the manner indicated, the normal demands of the trade, as unexpected and unforseen conditions may arise that will make full performance of its duty impracticable and exonerate it from liability for failing to discharge its duty, but it can make a fair estimate of the number needed, based on mine rating and capacity and its experience in handling the traffic, and it must supply itself with and maintain the number needed to meet the average demand of the trade during the months when

the trade is heaviest, and no less than this will answer it duty.

This being our view of the law, it is quite clear from the evidence that the railroad company did not have a sufficient supply of cars to meet the normal demand during the busy months for several years, including 1910, although it had many more than was necessary during the spring and summer months, and in failing to have a sufficient supply to fill the normal demand during the fall and winter months it committed a breach of the duty that it owed to the coal company, thereby becoming liable to it in damages.

The instructions given by the court are as follows:

"1. The court instructs you that it was the duty of defendant at the times complained of to provide and maintain reasonably adequate and sufficient facilities, that is, cars, for the transporation of all coal which might ordinarily be expected to seek transportation along its line of road, including plaintiff's coal in question; and that it was also the duty of defendant to use reasonable care and diligence to furnish cars to plaintiff at its mine when requested or demanded by it for the transportation of the coal then being mined and shipped by plaintiff over defendant's road, but defendant was entitled to be given reasonable notice by plaintiff prior to the time or times said cars were needed to be furnished for the transportation of plaintiff's coal at the time or times in question.

"So if you shall believe from the evidence that plaintiff at the time or either one or more of them, in the month of October, 1910, as complained of and mentioned in evidence, requested or demanded of defendant or its authorized agent to furnish and place at its mine any car or cars in which to load, and transport plaintiff's coal, then being mined, if it was, and shall further believe from the evidence that defendant failed or refused to furnish and place said car or cars at said mine at said time or times when needed, although defendant had reasonable time in which to do so, if it did, after notice was given or its said agent, if any was given, that said car or cars were so needed, and if you shall further believe from the evidence that such failure or refusal, if any, was due to inadequate or insufficient supply of cars provided and maintained by the defendant for transportation of such coal as might have been reasonably ex-

pected to seek transportation over its line as above required, or if it was due and occasioned by reason of the failure, if any, of defendant's employe or employes in charge thereof to use reasonable care and diligence to furnish and place said cars at the time or times needed and demanded upon reasonable notice, if any, as above required and if by reason and on account of either of such failure, if any there was, plaintiff was unable to run its mine or transport its coal, and thereby sustained a loss in its profits, or was compelled to and did expend money in maintaining its plant while idle, if any, then in that event you should find for the plaintiff and award to it such an amount or amounts as will fairly and reasonably compensate for such loss, if any, so sustained and which was the direct and proximate result thereof, the measure of recovery being the reasonable difference, if any, in what it actually cost plaintiff to mine and place said coal on the market, and what it could have reasonably sold it for, on such coal as plaintiff could have reasonably mined, and sold at said time or times, and also the actual expenses incurred in wages paid out and for the reasonable cost of the fuel used to maintain said plant by plaintiff at said time or times while so remaining idle, if any, on account thereof not exceeding upon the whole the sum of $908.20, but unless you should so find and believe from the evidence as above required, you must find for the defendant.

"2. The court further instructs you that defendant was not required to anticipate an abnormal demand for cars, or an unprecedented and unexpected press of business and to keep cars to meet such contingency, so if you shall believe from the evidence that defendant provided and maintained at the times in question a reasonably adequate or sufficient number of cars for the handling and transportation of coal which might have been reasonably expected to seek transportation along its lines, including plaintiff, and if you shall also believe from the evidence that defendant or its agents in charge thereof used reasonable care and diligence to furnish cars to plaintiff, and did, without preference or discrimination, furnish same to plaintiff, if it did so, at its mine after being notified a reasonable time before the said time or times that such cars would be needed at said

time or times, if it was, then in that event you should find for the defendant.

"3.   The court further instructs you that by reasonable care and diligence as used in the foregoing instructions is meant such care and diligence as an ordinarily prudent person would usually exercise in like business and under the same or similar circumstances as proven in this case."

These instructions are criticised because, as said by counsel, they fail to point out the duty that the railroad company was under to refrain from discriminating in favor of the appellee coal company.   It is a sufficient answer to this criticism to say that no question of discrimination or preference is involved in this case.   The coal company distinctly disavows any purpose to charge the railroad company with discriminating against it or showing preference to other mine owners.   The only substantial issue in the case was whether the railroad company had or not a sufficient supply of cars to meet the demand, and this issue was fairly and correctly submitted in the instructions.

It is also complained that the instruction defining the measure of damage is erroneous in that it takes no account whatever of the value of the coal left in the ground but assumed that the expense of mining the coal represented its total cost.   This criticism is well taken, and the jury should have been told that the measure of damage was the reasonable difference, if any, in what it actually cost plaintiff to mine and place coal on the market, less the value of the coal in the mine, and what it could have reasonably sold it for.   But as the recovery was only for $200 this error is not of sufficient importance to justify a reversal.

It is further insisted that the lower court should have granted a new trial on the ground of newly discovered evidence, but this position is not well taken.   W. T. Drury testified that in November, 1910, when the mine he was president of or connected with was short of coal cars he saw nine empty cars standing on a siding of the appellant company not far from the mine he was interested in, and this evidence was evidently put in for the purpose of attempting to show that the railroad company had cars that it could but failed to furnish.

Accompanying the motion for a new trial there appears the affidavit of J. R. Daugherty, stating that he

was station agent for the railroad company at Morgan-
field where these empty cars were, and that it could have
proved by Daugherty, had he been introduced as a wit-
ness, that these cars were owned by the Southern Rail-
way Company, and at the time they were seen on the
siding were being hauled for it by the appellant railroad
company to some point in the South, where they were to
be delivered to the Southern Railway.

In view of the fact that the evidence of both parties
was directed to the question of showing whether or not
the railroad company had an adequate supply of cars,
this evidence of Drury although incompetent, was not
prejudicial. But aside from this, W. T. Drury, when he
testified to the fact that these empty cars were standing
on the siding, was giving evidence in another case
against the railroad company that was tried in connec-
tion with the case of the appellee company, and the evi-
dence of W. T. Drury has no place in the case we are
now considering.

In respect to the appeal from the judgment dismiss-
ing the petition for a new trial filed by the appellant
against the appellee, little need be said. It appears from
the petition that a witness introduced for appellant on
the trial of the damage suit of the appellee against it
testified that it was interested in coal mines on its line
of road in the State of Illinois. It averred in its peti-
tion that this statement was not true, but that the attor-
neys who represented the railroad company on the trial
in the lower court in which the evidence was given, did
not know that the testimony was without foundation in
fact. It further averred that its officers and agents,
who had knowledge of the truth of this matter, did not
learn of the testimony of this witness until after the
trial in which it was given was concluded. It further
averred that the evidence given by this witness was
very prejudicial to it, and on the ground that it was
taken by surprise by his testimony, a new trial was
asked.

Although it is claimed that the new trial was sought
in this petition on the ground of newly discovered evi-
dence, we gather from the averments of the petition
that the new trial was sought to give the railroad com-
pany an opportunity to correct a misstatement made by
one of its witnesses on the former trial rather than for
the purpose of being permitted on another trial to in-

troduce new evidence. But be this as it may, the petition did not state sufficient reasons to authorize the granting of a new trial, and so the court properly sustained a demurrer to it. It is provided in subsection 7 of section 340, of the Civil Code, that a new trial may be granted upon the ground of newly discovered evidence material for the party applying, which he could not, with reasonable diligence, have discovered and produced at the trial, and in section 344, setting forth the practice by which a new trial may be obtained upon the ground of newly discovered evidence, it is provided that "if grounds for a new trial be discovered after the term at which the verdict or decision is rendered the application may be made by a petition filed with the clerk." It will be observed that a new trial is only allowed under section 344 when the ground upon which the new trial is asked is, discovered after the term at which the verdict or decision was rendered, and there is no allegation in the petition that the grounds relied on were not discovered until after the expiration of the term. If a new trial on the ground of newly discovered evidence is asked and the newly discovered evidence is ascertained before the expiration of the term, then the application for a new trial should be made in the manner pointed out in sections 340 and 343 and not by a petition. In addition to this objection to the petition, we may further add that the reasons for asking a new trial were not sufficient to authorize the trial court to grant one, even if these reasons had been presented in the proper time and manner.

The judgment in each case is affirmed.