[Civ. No. 14521. Second Dist., Div. Three. Jan. 17, 1945.]

E. NEWMARK, Respondent, v. PACIFIC FREIGHT LINES (a Corporation), Appellant.

Hugh Gordon for Appellant.

Samuel Mirman for Respondent.

WOOD (Parker), J.—The Pioneer Provision Company, a manufacturer of meat products, hereinafter referred to as the shipper, employed the defendant, a common carrier by motor trucks, to transport 7,598 pounds of chilled fresh sausage from Los Angeles to Camp Roberts, an army camp near San Luis Obispo. By reason of heavy rainfall which caused the highway to be closed, the defendant did not send the sausage forward immediately after it received it from the shipper on January 22, 1943, but held it at its terminal in Los Angeles about 48 hours. When the sausage arrived at its destination on January 25, 1943, it was rejected by the inspecting officer for the reason that it was spoiled. In this action by the assignee of the shipper to recover damages resulting from the delay in transporting the sausage, plaintiff obtained judgment for $2,110.91 damages. Defendant appeals from the judgment.

Defendant contends that it used reasonable precautions to prevent damage to the sausage; that the loss was not caused by any negligence of defendant; and that the delay was caused solely by an act of God. There is no issue on this appeal concerning the amount of damages.

The sausage was placed on defendant's truck at the shipper's place of business in Los Angeles on Friday, January 22, 1943, about 4 p. m., and at that time the sausage had been made about 10 hours, had been chilled to a temperature of 38 degrees, and was in good condition. Without further refrigeration, the sausage, under the weather conditions then prevailing, would have remained "without spoilage" approximately 30 hours. In the ordinary course of events a shipment "picked up" by defendant at the shipper's place of business about 4 p. m. would arrive at Camp Roberts the following day prior to 1 p. m., that is, the shipment would be in transit about 20 hours. The sausage was in "cellophane casings" and then was packed in corrugated fiber cartons for shipment, each of which

cartons contained about 75 pounds of sausage. There were 101 such cartons. In dimensions each carton was about 12 inches by 12 inches by 16 inches. Each carton was stencilled on the end thereof, in letters 1 inch high, as follows: "Pork sausage, Fresh, Chilled." There was a bill of lading which stated that the shipment contained 101 packages of "Pork Sausage" which weighed 7,598 pounds net, and also stated the name of the shipper. At the time of loading the sausage on defendant's truck the shipper's employees took the cartons of sausage from the refrigerator and handed them to defendant's employees who were on the truck and who placed them in the front part of the truck, close together, in 4 tiers 4 cartons high. The sausage did not fill the truck. The truck had a 20-foot open stake-body. The stakes or "side racks" were about 6 feet in height and the ridge pole was about 7 feet above the floor of the truck. The open portion of the truck was covered with a tarpaulin which rested on the ridge pole and the side racks, and extended downward to, and was fastened to, the outer edges of the floor. From the shipper's place of business the truck went to defendant's terminal in Los Angeles, where it arrived about 4:30 p. m. When it arrived there, the only freight on it was the sausage. The defendant then completed the loading of the truck with various shipments of other freight. For several days prior to the time the sausage was placed on the truck, a heavy rainstorm had been prevalent in Southern California. It was raining when the truck arrived at the Los Angeles terminal. After defendant had the load ready to go and had called a driver to proceed with it, the defendant received a report from the State Highway Patrol to the effect that by reason of the heavy rains the roads to Camp Roberts were not open. As a result of that report and of a similar report received the next afternoon, Saturday, January 23, the truck did not leave defendant's Los Angeles terminal until Sunday, January 24, at 3:15 p. m. that is, approximately 48 hours after the sausage had been loaded on the truck.

Defendant did not notify the shipper that there was a delay, and left the loaded truck, covered with a tarpaulin, in the open yard of its terminal. On Saturday, January 23, about 4 p. m. defendant rolled the tarpaulin back, and placed 50 pounds of broken dry ice over the top layer of the cartons of sausage and replaced the tarpaulin. On Sunday afternoon, January 24, defendant placed another 50 pounds of dry ice on the sausage in the same manner that the first 50 pounds

had been placed thereon. The truck left the Los Angeles terminal for Camp Roberts on Sunday, January 24, at 3:15 p. m. It arrived at Camp Roberts on Monday, January 25, about 1:30 p. m., that is, it arrived at its destination about 70 hours after the sausage had been loaded on the truck. An army officer, who inspected the sausage upon its arrival, rejected it for the reason that it was unfit for human consumption. Defendant notified the shipper that the sausage had been rejected, and the shipper instructed defendant to re-ice the shipment and return it to the shipper in Los Angeles. At Camp Roberts defendant placed 80 pounds of dry ice, which was all defendant "could get," on top of the sausage and returned it to the shipper.

The principal question is whether defendant used reasonable precaution to prevent damage to the sausage. Even if the rains caused the roads to be in such condition that defendant was justified in delaying the shipment, the question remained as to whether defendant used reasonable care to protect the sausage after it knew there would be a delay. When defendant determined on Friday afternoon, January 22d, that it would not start the truck to Camp Roberts that afternoon, as was contemplated by the shipper, the defendant did not notify the shipper that afternoon that there would be a delay. The defendant did not notify the shipper on the following day, Saturday, or on the next following day, Sunday, or at all that there would be a delay. Defendant contends that it could not notify the shipper that there was a delay for the reason there "was no record at the time of the names of shippers whose shipments were thus delayed," and that to have ascertained the names of the shippers it would have been necessary to unload 29 trucks, containing approximately 1,200 shipments, and that defendant did not have a sufficient number of men to do such work. The truck upon which the sausage was loaded was number 217. It appears that defendant did not keep a record from which it could determine what or whose freight was on a particular truck. The failure of defendant to keep sufficient records from which it could determine the names of shippers and the kinds of freight on a particular truck was not a circumstance tending to prove that defendant used reasonable care in protecting the sausage. It does not appear that the shipper knew that defendant did not keep records which would show what and whose freight was on a particular truck, and the shipper was not chargeable with

knowledge of defendant's failure to keep such records. There was no duty on the part of the shipper to make inquiry as to whether the shipment was going forward without delay. The shipper had shipped sausage by way of defendant's lines on previous occasions and it was entitled to assume, until it had notice to the contrary, that the shipment would proceed according to schedule. The contention of defendant, that it would have been necessary to unload 29 trucks in order to ascertain the names of the shipper, implies that if a truck were unloaded and thereby a particular shipment was located then the name of that shipper could be ascertained. It does appear that defendant did ascertain that there was a large quantity of sausage on truck 217, inasmuch as defendant iced the sausage on Saturday and Sunday. Having located the sausage, even though the truck was not unloaded, it would seem that the name of the shipper could have been readily ascertained either by inspection of the packages or by inquiry among the employees who loaded the sausage on that truck. Furthermore, as above shown, there was a bill of lading which stated the name of the shipper, and that the shipment was 7,598 pounds of pork sausage. It therefore appears that defendant located the sausage even though it had not unloaded the truck; that defendant recognized the sausage as perishable property, inasmuch as it placed ice on it; and that defendant could have ascertained the name of the shipper readily through the bill of lading and otherwise. If defendant had notified the shipper that there was a delay, even as late as 4 p. m., Saturday, when it iced the sausage, such notice being given about 24 hours after the sausage was taken from the refrigerator would have afforded the shipper sufficient time to properly protect the sausage. The defendant failed in its duty to notify the shipper of the delay. By reason of such failure the shipper was deprived of an opportunity to protect the sausage.

Defendant undertakes to excuse its failure to notify the shipper of the delay by asserting that the method of icing which it employed was the "usual and customary method employed in the trucking industry for the refrigeration of perishables" which are not "loaded in refrigerator trucks." The army officer, who inspected the sausage and who qualified as an expert in methods of refrigerating meat and sausage, testified that the method of icing used by defendant would have "very little" effect on sausage, but "might" refrigerate the

top layer a few inches down; that if the sausage remained at defendant's terminal approximately 23 hours and was iced on Saturday and Sunday in the manner asserted by defendant, it would spoil; that "that type of icing did not constitute icing" of such a shipment; and that a "canvas covered truck" is "not insulated against heat," and the canvas "does not hold the temperature, it radiates." Since there were 7,598 pounds of sausage to be protected by the ice it appears that the 50 pounds used in each icing was in the approximate proportion of 1 pound of ice to each 150 pounds of sausage. As above noted, the sausage was in 101 cartons which were close together in 4 tiers 4 cartons high, and the ice was placed on the top layer of cartons. The method of icing used by defendant was altogether inadequate and defendant did not use reasonable care in protecting the sausage.

Defendant asserts further that a carrier is not liable for failure to render a service which it has not undertaken, and that defendant did not operate or offer to the public a refrigerator service. Counsel for defendant stated in his brief that: "It may be conceded that if the shipper had notified the defendant by a statement on the bill of lading or otherwise that the shipment was perishable and required refrigerants in case of delay, reasonable diligence would have required different action on the part of defendant in the discharge of its common carrier duty. . . ." The evidence shows that each of the 101 cartons of sausage was plainly marked that it contained chilled fresh sausage; that defendant's employees loaded those cartons on the truck at the shipper's meat packing plant; that the defendant did undertake to carry the sausage knowing it was perishable; that it had undertaken to and had transported fresh sausage to Camp Roberts for this shipper on other occasions; that it was customary for defendant to use dry ice to preserve perishables; and that in the usual course of events this shipment would have been transported successfully to its destination.

It is a carrier's duty to take proper measures for the preservation of perishable goods in transit, and a failure to comply with this duty, which results in loss or injury to the shipper, renders the carrier liable for the damage sustained. (3 Cal.Jur. 10-Yr. Supp. 321, § 46a; *Jacobs, Malcolm & Burtt* v. *Northern Pac. Ry. Co.* (1925), 71 Cal.App. 42, 43-44 [234 P. 328].) "The general rule is that, in order to excuse the carrier for a loss upon the ground that it was caused by

an act of God, such act must have been the proximate cause of the loss.'' (9 Am.Jur. 853, § 712.) ''Even though the immediate or proximate cause of a loss in any given instance may be what is termed the act of God, nevertheless, if the negligence of the carrier mingles with it as an active and co-operative cause, the carrier is still responsible; in other words, where the negligence of the carrier concurs in, and contributes to, the loss or injury, the carrier is not exempt from liability on the ground that the immediate damage is occasioned by vis divina. The act of God, to excuse the carrier, must, according to the better opinion, be not only the proximate but also the sole cause of the loss.'' (9 Am.Jur. 854, § 713.) As above stated, irrespective of the cause for the delay, defendant did not use reasonable diligence to protect the shipment of sausage after it was known there would be a delay.

By reason of the foregoing, it is not necessary to discuss defendant's other contention to the effect that the finding that defendant negligently delayed the shipment was unsupported by the evidence.

The judgment is affirmed.

Desmond, P. J., and Shinn, J., concurred.