**V. L. JOHNSON, d/b/a V. L. Johnson Lumber Co., Appellant,**

v.

**CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD CO., Appellee.**

**No. 21998.**

United States Court of Appeals
Ninth Circuit.

Sept. 20, 1968.

Jerrold C. Park (argued) of McFadden & Park, St. Maries, Idaho, for appellant.

James E. Nelson (argued), B. E. Lutterman, Warren H. Ploeger, Seattle, Wash., Sidney E. Smith, Coeur d'Alene, Idaho, for appellee.

Before JOHNSEN,* BROWNING and CARTER, Circuit Judges.

JAMES M. CARTER, Circuit Judge:

■ This diversity action for damages, removed from the state court, was commenced by V. L. Johnson, d/b/a V. L. Johnson Lumber Co., hereafter "Shipper," against the Chicago, Milwaukee, St. Paul & Pacific Railroad Co., hereafter the "Railroad." At the close of the Shipper's case to a jury, the court on motion of the railroad, entered a dismissal with prejudice on the grounds of insufficiency of the evidence.[1]

The sole questions presented for decision are:

(1) the sufficiency of the evidence as to liability;

(2) the sufficiency of the evidence as to damages.

The Shipper, in his complaint, set forth three causes of action: (1) that the Railroad, a common carrier, discontinued freight services theretofore provided to the Shipper and refused to ship lumber, in violation of its common law and statutory duty as a carrier; (2) that a tunnel cave-in on the Railroad's line, which resulted in the suspension and termination of rail service to the Shipper, was the direct result of the Railroad's negligence and failure to reasonably maintain its line; (3) that following the cave-in and suspension of the service, the Railroad negligently and in violation of its statutory duty failed to make reasonable efforts to repair the tunnel and restore service.

---

* Harvey M. Johnsen, Senior United States Circuit Judge, Eighth Circuit, Omaha, Nebraska, sitting by designation.

1. The Railroad, at the close of the Shipper's case, moved for an "involuntary dismissal" apparently under Rule 41(b) F.R. Civ.P. This was permissible in jury cases until 1963 when the rule was amended to make it clear that the dismissal motion at the close of plaintiff's case applied in only non-jury cases. However, the court may treat the motion for dismissal as a motion for a directed verdict under Rule 50(a) F.R.C.P., Wolf v. Reynolds Electrical & Engineering Co., 304 F.2d 646 (9 Cir. 1962), decided before the amendment of 1963. But see Woods v. National Life & Acc. Ins. Co., 347 F.2d 760 (3 Cir. 1965).

The Railroad denied the allegations of plaintiff's complaint and as an affirmative defense alleged that the cave-in, resulting in the suspension of service, "was not caused by any act, omission or negligence of the defendant, but was proximately caused by an Act of God."

The Shipper, from 1963 through 1966, was the owner and operator of a sawmill at Elk River, Idaho. During this period he shipped substantial quantities of lumber over the Railroad's line, approximately 90 percent of which was transported interstate outside of Idaho. Elk River is located 20 miles from the nearest paved road and 50 miles from the nearest major highways. The Railroad is the only rail carrier so serving Elk River and the only common carrier hauling lumber from Elk River. The Railroad's branch line runs from Elk River to St. Maries, Idaho, where it connects with the Railroad's main line.

On this branch line existed the Neva Tunnel. In April 1966, a partial cave-in or blockage of this tunnel caused temporary suspension of rail service in and out of Elk River. The blockage was cleared within a few days and service restored, but on May 12, 1966, after inspection of the tunnel by agents of the Railroad, service was discontinued without any prior notice to Shipper.

Service was restored about October 17, 1966, subsequent to the filing of this action but prior to the trial thereof in April, 1967. The restoration of the service was brought about by "daylighting" or substituting an open cut for the tunnel. This work was done at the joint expense of the Railroad and the State of Idaho.

### ISSUE AS TO LIABILITY

 It is Hornbook law that the plaintiff Shipper is entitled to the benefits of all reasonable inferences that can be drawn by the jury from the evidence, and that the credibility of the witnesses and the weight their testimony deserves are questions for the jury.

█ The Shipper's first cause of action is based on the obligation of the Railroad, a carrier, to receive, carry and deliver all goods offered to the carrier for transportation. The obligation rests on common law principles, Wabash Railroad Company v. Pearce, 192 U.S. 179, 187, 24 S.Ct. 231, 48 L.Ed. 397 (1904), as well as on statute. 49 U.S.C. Sec. 1 (4) and (11). In fact the federal statute, supra, is declaratory of common law. Illinois Central R. Co. v. River, etc., Coal, etc., Co., 150 Ky. 489, 150 S.W. 641, 44 L.R.A.,N.S., 643 (1912). This obligation of the carrier at common law is independent of the contract of carriage. Hannibal Railroad Co. v. Swift, 12 Wall. (79 U.S.) 262 at 270, 20 L.Ed. 423 (1870). This common law duty and obligation of the carrier has not been abridged by the Interstate Commerce Act. Section 22 of the Act, 49 U.S.C.A. § 22 reads in part:

" * * * nothing in this chapter [act] contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies; * * *."

Pennsylvania R. R. Co. v. Puritan Coal Mining Co., 237 U.S. 121, 129, 35 S.Ct. 484, 59 L.Ed. 867 (1915), and Pennsylvania R. R. Co. v. Sonman Shaft Coal Company, 242 U.S. 120, 124, 37 S.Ct. 46, 61 L.Ed. 188 (1916), to the same effect.

Idaho law whose pertinency we do not decide, also provides that the common law duties of carriers are not supplanted or limited by Idaho law. Idaho Code § 62-402 and 62-403.

█ Thus, the primary burden is on the carrier, once its neglect or refusal to transport goods is shown, to present a defense or excuse for its non-performance. In an early case in this circuit, Swayne & Hoyt v. Everett, 255 F. 71 (9th Cir. 1919) this court said:

"It does not admit of doubt that a common carrier, with certain well-established exceptions, is under legal obligation to carry the goods of any

member of the public who may tender them for carriage. That such a carrier, subject to such legal obligation, may show that it was prevented from performing it by act of God or a public enemy, or by some other cause *over which it had no control,* is readily conceded, but in all such cases the defense is an affirmative one, *and the burden is upon the carrier to both plead and prove it."* 255 F. at p. 74. [Emphasis supplied]

■ Later decisions have expanded these exceptions only slightly, holding that the carrier is liable without proof of negligence unless it affirmatively shows that (1) the loss resulted from acts of the Shipper; (2) acts of God; (3) public enemy; (4) public authority, or (5) the inherent vice or nature of the commodity. Secretary of Agriculture v. United States, 350 U.S. 162, 165 note 9, 76 S.Ct. 244, 100 L.Ed. 173 (1956); Missouri Pacific Railroad Co. v. Elmore & Stahl, 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964).

■■ The Railroad alleged an act of God as an affirmative defense. The burden was on the Railroad to affirmatively prove this defense. Secretary of Agriculture v. United States, supra; Missouri Pacific Railroad Co. v. Elmore & Stahl, supra. As stated by Judge Fee while on the district court, in Montgomery Ward & Co. v. Northern Pacific Terminal Co., 128 F.Supp. 475, 511 (1953), "Even where prevented by an act of God or the public enemy, there must be an affirmative showing that it (the carrier) did everything in its power to carry out its absolute obligation."

■ The carrier is not excused if the interference with its service could have been avoided by forethought. Applying this principle, the Supreme Court imposed liability upon an Express Company for gold lost to a band of armed robbers, even though the receipt for the gold issued by the Express Company exempted it from losses due to "mobs, riots, insurrection or pirates." The Company had a choice of two routes, one a safe route and the other running through dangerous and unsettled country. By failing to choose the safer route, the carrier was negligent and subjected itself to liability. United States Express Co. v. Kountze Bros., 8 Wall. (75 U.S.) 342, 19 L.Ed. 457 (1869). A carrier must anticipate problems and provide against them. Baker v. St. Louis etc. Railroad Co., 145 Mo.App. 189, 197, 129 S.W. 436, 438 (1910); Chicago, B. & Q. R. Company v. Manning, 23 Neb. 552, 37 N.W. 462, 464–465 (1888). Lehigh Valley Railroad Co. v. Allied Machinery Company of America, 271 F. 900, 903 (2 Cir. 1921), cert. denied 256 U.S. 704, 41 S.Ct. 625, 65 L.Ed. 1180.

■ The Shipper's second cause of action was based on negligence. A carrier is required to use diligence and care in the performance of its duties, United States Express Co. v. Kountze Bros., supra; New York Central Railroad Company v. Lockwood, 17 Wall. (84 U.S.) 357, 383, 21 L.Ed. 627 (1873); Bank of Kentucky v. Adams Express Co., 93 U.S. 174, 23 L.Ed. 872 (1876). See Chicago & E. I. Railroad Co. v. Collins Produce Company, 249 U.S. 186, 39 S.Ct. 189, 63 L.Ed. 552 (1919).

■ As to the excepted causes, such as an act of God, which will ordinarily relieve the carrier from liability, the carrier may nevertheless be liable because of its own negligence or that of its agents, servants or employees. Robinson v. Bush, 199 Mo.App. 184, 200 S.W. 757, 760 (1918); Fean v. Alabama Great Southern Railroad Co., 26 Ohio App. 96, 159 N.E. 487, 489 (1927); L. E. Whitlock Trucking Service, Inc. v. Regal Drilling Co., 333 F.2d 488, 491 (10 Cir. 1964).

■ Even where the loss is caused by an act of God or other excepted cause, if the carrier's negligence mingles with the excepted cause as an active or cooperating cause, there is liability on the carrier. Chesapeake & O. Ry. Co. v. J. Wix and Sons Ltd., 87 F.2d 257, 259 (4 Cir. 1937); Farr Co. v. Union Pac. R. Co., 106 F.2d 437, 439 (10 Cir. 1939). See; Newmark v. Pacific Freight Lines, 67 Cal.App.2d 548, 155 P.2d 68 (1945); Chicago &

E. I. R. R. Co. v. Collins Produce Co., 235 F. 857, aff'd 249 U.S. 186, 39 S.Ct. 189, 63 L.Ed. 552.

Since we hereafter hold that there was sufficient evidence to go to the jury on both the Shipper's first and second causes of action, we do not comment on Shipper's third cause of action that the Railroad failed to make reasonable efforts to repair the tunnel and restore service; and the Shipper's other contention that the Railroad should have used alternate methods of shipping. Nor do we pass any opinion as to the validity of these theories or causes of action or intimate that they are valid, or invalid.

The evidence, viewed in a light most favorable to the appellant Shipper, showed that there had been a collapse or cave-in of the tunnel some three to four weeks prior to its closing, but the obstruction had been cleared away. On or about May 12th, the tunnel was ordered closed by the Railroad's Division engineer. His action was caused by his belief that the tunnel was unsafe, following his inspection on or about May 12th. His reasons stated were that the tunnel was showing signs of new and rapid deterioration, evidenced by many cracks in the timbers, with some supports broken completely.

As far back as 1955 and 1956, the Railroad negotiated with Idaho in an effort to persuade the Highway Department of the state to bear the major part of the cost of daylighting the tunnel. As early as 1956, one of the Railroad's employees, after an inspection, called attention to the condition of the tunnel, the tunnel lining and the crushed and split condition of many of the supports. He said further " * * * the rotten original lining could not form a solid backing for them (helper vents). We are spending a lot of money and still losing ground." Later in December 1956, after negotiations with the State for the joint daylighting project seemed to have bogged down, he reported " * * * we should definitely plan on the concrete lining not later than 1958."

In December 1965, Idaho proposed further negotiations but the Railroad did not respond until after the cave-in of April 1966. However, the Railroad between the shut down of the tunnel on May 12, 1966, and the solicitation of bids for day-lighting on July 22, 1966, finally got down to studying the problem and reached an ultimate agreement with Idaho. The contract for the day-lighting was dated August 17, 1966, work commenced August 29, 1966, and was completed October 14, 1966, and service restored October 17, 1966. A little over a month elapsed between the solicitation of bids and the commencement of work, and the work itself took approximately six weeks.

The evidence also showed that the tunnel, built in 1910, had been maintained since 1954 on a temporary "stop-gap" basis. Inspections of the tunnel in 1964 showed it to be in bad condition and deteriorating. The Railroad section foreman, after checking the tunnel, reported in 1964, " * * * one of the top timbers and one on the side have came [sic] out right at the joint where the top decking comes together and it appears * * * that other timbers are cracking." Also in 1964 Pajari, the division engineer and his superintendent reported, "We have considerable work to be done on the Neva tunnel this year and the portion of the tunnel where the two pieces fell out is included in '64 work." Despite this report there was testimony that no maintenance or repair work was done in 1964 or 1965.

In support of its contention that the closure of the tunnel and suspension of service was caused by an act of God, the Railroad relied on testimony which referred to "a massive movement of rock and earth above the tunnel."

The testimony concerning a massive movement of earth must be considered with other evidence. Pajari, the division engineer for the Railroad testified that the May 1966 situation differed from previous trouble in that "the natural failure of timbers because of age, moisture and so forth, but this was actually a separation of the fibres of the timbers."

Reference was made to the pressure of the rock and earth above, and the witness stated the pressure "would be horizontal as well as vertical in places and there had been displacement of the timbers of the tunnel at the Bovill end." As to the cause of the purported earth movement, the witness over objection, stated "all structures of nature, all grades, disintegrate, leveling out. There is an action of the elements of water and so forth, on portions of the Neva tunnel and this was an accumulation of earth formation and stresses that caused the failure."

Smith, the regional engineer for the Railroad, reported new cracks or additional openings in the old cracks in 90% of the post or segment members and that 20% of the defective supports showed cracks in the vertical plane indicating longitudinal movement of the timber tunnel lining; that the remainder of the cracks were in the horizontal plane of the members "indicating a vertical load undoubtedly unevenly distributed causing the failure."

The foregoing evidence must be read against the 1955 memorandum, in which a Railroad employee stated " * * * even if the tunnel was never day-lighted these helper bents are only temporary, as they will be placed on a backing of old, rotten timber, which formed the original lining of the tunnel." In another Exhibit, dated in 1956, a Railroad employee reports "As near as I can determine the cause of this condition (separation and dropping out of crown timbers) is [sic] due to old original lining being left in place and repair lining set inside. Present lining is now shoving back on the sides permitting crown timbers to loosen and drop out."

In his memorandum of April 25, 1966, following the cave-in, Pajari, the division engineer reported "It is not quite certain whether the failure of the frames precipitated slide material into the bore or whether the reverse was true * * * Please note particularly that the past repairs have been made by inserting new frames inside the old untreated frames which account [sic] decay show distortion [sic] which in turn permits distortion of the newer frames."

At the trial Pajari testified that the reason for taking the tunnel out of service was "actually it was the movement of the frames supporting the rock and earth above the tunnel." He further testified that the alleged "massive movement of earth" which the Railroad relied on as an act of God, was a common natural occurrence, and one which could be anticipated although the exact location of any such occurrence would not be predictable with any certainty.

■ At the time the Shipper rested his case and the court took it from the jury, the case bristled with factual issues as to liability. Was there a massive earth movement or merely further deterioration of the tunnel? If there was a massive earth movement, was it an act of God? Could the happening have been foreseen and guarded against.? Had the Railroad been negligent in the maintenance of the tunnel? Did the negligence contribute to the closing of the tunnel? Could proper repair and maintenance have avoided the closing of the tunnel in May 1966? These and others, were issues of fact as to liability which should have gone to the jury.

### The Damage Issue

■ In this diversity case Idaho law controls on the damage issue. In Gorton v. Doty, 57 Idaho 792, 811, 69 P.2d 136, 145 (1937) the court said:

"Damages are susceptible to proof only with an approximation of certainty, and it is solely for the jury to estimate them as best they can by reasonable probabilities, based upon their sound judgment as to what would be just and proper under all the circumstances, * * *".

The same holding from Gorton, supra, was quoted in Shrum v. Wakimoto, 70 Idaho 252, 256, 215 P.2d 991 at 993 (1950).

In Williams v. Bone, 74 Idaho 185, 188, 259 P.2d 810, 812 (1953), the court held:

"Where a regular and established business is injured, interrupted or destroyed by the wrongful acts of another, the measure of damages * * * is the net loss and not diminution in gross income. * * * [T]he measure of damages would be the loss of profits, if any, resulting from the wrongful act."

The case is particularly persuasive because plaintiffs, for their proof, produced their records showing profits for previous years and loss of profits, decrease of business, deficits and a net loss for the years in which damage was claimed. Boise Street Car Co. v. Van Avery, 61 Idaho 502, 512, 103 P.2d 1107, 1111 (1940) holds that damages for injury to an established business need only be established with reasonable certainty.

In Conley v. Amalgamated Sugar Co., 74 Idaho 416, 423, 263 P.2d 705, 709 (1953) the court held that "the mere fact that it is difficult to arrive at the exact amount of damages where it is shown damages resulted, does not mean that damages may not be awarded and it is for the trier of fact to fix the amount".

The evidence showed the results of the Shipper's operation in the prior year, 1965, and his income tax return for 1965 showing $5,346.80 in net profit. Profit by carload could be computed since the evidence showed 44 carloads were shipped in 1965.

The Shipper's 1966 income tax return showed a loss of $30,586.86. However, testimony developed a fire loss which was deducted. The net loss from the operation of the sawmill alone was $21,210.46. The testimony further showed that the only reason for the loss was inability to ship lumber; that the Shipper had better facilities and more inventory starting the year than in 1965; that the market in 1966 was better than in 1965 and one time in the summer was at a record high. Inventories from December 1964 to Jan-

uary 1967 were in evidence. When the Shipper suspended logging in July 1966, he had "probably 300,000" logs on hand.

Finally, the evidence showed that in addition to the one carload handled by the Railroad by truck, the Shipper sent small amounts out by truck; that the Railroad restored service on the line about October 17, 1966, but by November 1, 1966, the wet weather had set in, the roads were bad and the season for the shipping of lumber had ended.

In view of the *Idaho* cases, supra, and the standard set forth as to loss of profits, it is clear that there was sufficient proof to go to the jury on the issue of damages.

Since there were issues of fact as to liability and damages presented by the evidence, it was error to take the case from the jury and grant a "Motion for Involuntary Dismissal."

The judgment is reversed.