ETHAN ALLEN, INC.

v.

MAINE CENTRAL RAILROAD COMPANY.

Civ. A. No. 75–65.

United States District Court, D. Vermont.

May 4, 1977.

G. Clark Cummings, New York City, and Frederick deG. Harlow, Ryan, Smith & Carbine, Rutland, Vt., for plaintiff.

John M. Dinse, Dinse, Allen & Erdmann, Burlington, Vt., for defendant.

COFFRIN, District Judge.

On July 3, 1973 the Maine Central Railroad Company ("Maine Central"), a carrier subject to the Interstate Commerce Act

("Act"), 49 U.S.C. § 1, et seq., published an embargo notice ceasing all rail service on its 22.96 mile dead-end line from North Stratford, New Hampshire, to Beecher Falls, Vermont, because of tract structure damage from heavy rains and flooding. The principal victim of this cessation of operations was Maine Central's sole customer on that line, Ethan Allen, Inc., a furniture manufacturer with a plant in Beecher Falls, Vermont, which was specifically designed for product shipment by rail.[1] Several months elapsed during which no repairs were begun and the embargo was not lifted.

On March 20, 1974 the Interstate Commerce Commission ("ICC"), commenced a civil action in this Court seeking to enjoin Maine Central from alleged illegal abandonment of the Beecher Falls rail line. Ethan Allen, Inc. was an intervenor in that action. By Opinion and Order of July 18, 1974[2] this Court held that Maine Central had illegally abandoned the line in violation of Section 1(18) of the Interstate Commerce Act, 49 U.S.C. § 1(18).[3] We granted the injunctive relief sought in that action and ordered Maine Central to restore rail service to Beecher Falls. That order was affirmed by the United States Court of Appeals for the Second Circuit in *ICC v. Maine Central R. R.*, 505 F.2d 590 (2d Cir. 1974). In accordance with that order, repairs were made and service was restored in November 1974.

Ethan Allen then moved for an order requiring Maine Central to pay damages and attorney's fees sustained as a result of the illegal abandonment. In an Opinion and Order dated February 11, 1975, we held that damages were not available under §§ 1(18) and 1(20) of the Act, and denied plaintiff's motion for damages.[4] However, because that original action and the Opinion and Order of July 18, 1974 related solely to §§ 1(18) and 1(20) of the Act, the Court specifically withheld any consideration of whether damages would be available under another section of the Act or at common law.[5]

On March 1, 1975 plaintiff Ethan Allen, Inc. commenced the present lawsuit again seeking damages from the railroad for the increased shipping expenses incurred by plaintiff during the time of the illegal abandonment. Ethan Allen bases the present claim for damages on §§ 1(4) and 1(11) of the Act in connection with § 8 of the Act and on 30 Vt.Stat.Ann. § 1810 and common law.

On April 17, 1975 defendant moved for dismissal of the complaint for failure to state a claim upon which relief could be granted. Fed.R.Civ.P. 12(b)(6). The thrust

---

1. Prior to June 30, 1973, the Woodland Division of the St. Regis Paper Company was also a customer on the line to Beecher Falls, accounting for about 20 percent of the total carloadings on the line. On June 30, 1973 St. Regis discontinued operations at its Beecher Falls facility.

2. *ICC v. Maine Central R. R.*, Civil No. 74–81 (D.Vt., July 18, 1974).

3. The Interstate Commerce Act provisions dealing with abandonments or extensions of lines were comprehensively revised under Title VIII of the Railroad Revitalization and Regulatory Reform Act of 1976, P.L. 94–210, 90 Stat. 31, 125, §§ 801–802 (February 5, 1976). Section 801 of that Act completely overhauls § 1(18) of the Interstate Commerce Act, restating and clarifying existing ICC authority to require railroads to obtain a certificate of convenience and necessity from the Commission for extension of lines or construction of new lines. The Commission's authority relating to abandonments is eliminated from section 1(18) and is placed in a new section 1a after Section

1 of the Act. Paragraphs (19), (20), (21), and (22) of Section 1 are repealed. Because this action arises under §§ 1(4), 1(11) and 8 of the Act which were not amended by the Railroad Revitalization Act, the 1976 amendments do not affect the outcome of this case.

4. *ICC v. Maine Central R.R.*, Civil No. 74–81 (D.Vt. February 11, 1975). In denying the motion for damages, this Court followed the general rule announced in *Powell v. United States*, 300 U.S. 276, 57 S.Ct. 470, 81 L.Ed. 643 (1937) that § 1(20), which provides only for injunctive relief, is "the only method for enforcing Section 1(18)," 300 U.S. at 287, 57 S.Ct. at 476.

5. "While it may be that the facts which establish an unlawful abandonment may have a bearing on the existence of other sections of the statute or of common law, that issue is not now before this court." *ICC v. Maine Central R.R.*, Civil No. 74–81 (D.Vt. February 11, 1975), at 6.

of defendant's contention was that Ethan Allen had already had its day in court and was barred by res judicata from rearguing issues litigated in the previous action.

. Because we determined that the present case states a different cause of action and presents issues which were not raised, litigated, and adjudicated in the previous action, we denied the defendant's motion to dismiss in an Opinion and Order of July 1, 1975.[6]

Defendant now moves for summary judgment on the ground that federal law precludes an action for damages on the facts of this case and that no valid state or common law authority exists upon which to base such an action. Because we believe that damages are available under the Interstate Commerce Act in this case, the defendant's motion for summary judgment is denied.

■ The relevant portions of §§ 1(4) and 1(11) set out in the margin,[7] establish the duty of every common carrier to provide and furnish "transportation" and "car service", respectively. The word "transportation" in the Interstate Commerce Act is defined in § 1(3),[8] and is meant to include the entire body of services provided by common carriers incident to the carriage itself. *Southern Ry. v. Reid*, 222 U.S. 424, 440, 32 S.Ct. 140, 56 L.Ed. 257 (1912); *Cleveland, C., C., & St. L. Ry. v. Dettlebach*, 239 U.S. 588, 593, 36 S.Ct. 177, 60 L.Ed. 453 (1916).

The term "car service" is defined in § 1(10).[9] There is some overlapping in the definitions of "transportation" and "car service", but, as a general proposition, it has been held that " '[car] service' connotes the use to which the vehicles of transportation are put; not the transportation service by means of them." *In re Rules & Regulations 31 and 32; Nebraska Pub. Serv. Comm'n v. Chicago & N.W. Transp. Co.*, 193 Neb. 59, 225 N.W.2d 401, 409 (1975).

■ In any event, it is clear that both provisions operate to place upon a common carrier the duty to furnish a shipper upon reasonable request with necessary numbers and types of cars where relevant conditions of trade and transportation are normal. *Pennsylvania R.R. v. Sonman Shaft Coal Co.*, 242 U.S. 120, 37 S.Ct. 46, 61 L.Ed. 188 (1916); *Chicago, R.I. & P. Ry. v. Hardwick Farmers Elevator Company*, 226 U.S. 426, 33 S.Ct. 174, 57 L.Ed. 284 (1913); *Johnson v. Chicago, M., St.P. & P. R.R.*, 400 F.2d 968 (9th Cir. 1968). In fact, the duties imposed in §§ 1(4) and 1(11) rest on common law principles and the statutory provisions are declaratory of common law. *Johnson, supra* at 971; *ICC v. Baltimore & A. R.R.*, 398 F.Supp. 454, 466 (D.Md.1975), aff'd 537 F.2d 77 (4th Cir. 1976), cert. denied, 429 U.S. 859, 97 S.Ct. 159, 50 L.Ed.2d 136 (1976). It has long been recognized that the quasi-public nature of railroads entails a higher degree of public responsibility than is required of

---

6. *Ethan Allen, Inc. v. Maine Central R.R.*, Civil No. 75–65 (D.Vt. July 1, 1975).

7. *§ 1, par. (4). Duty to furnish transportation and establish through routes; division of joint rates.* It shall be the duty of every common carrier subject to this chapter to provide and furnish transportation upon reasonable request therefor, . . .

\*    \*    \*    \*    \*    \*

*§ 1, par. (11). Duty to furnish car service; rules and regulations.* It shall be the duty of every carrier by railroad subject to this chapter to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared to be unlawful.

8. *§ 1, par. (3). Definitions.* (a) . . . The term 'transportation' as used in this chapter shall include locomotives, cars, and other vehicles, vessels, and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported.
. . .

9. *§ 1, par. (10). 'Car service' defined.* The term 'car service' in this chapter shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment, and the supply of trains, by any carrier by railroad subject to this chapter.

most private corporations. A railroad may not, for example, justify a refusal to provide service solely on the grounds that to continue to provide the service would be inconvenient or less profitable. *See Montgomery Ward & Co. v. Northern Pac. Term. Co.*, 128 F.Supp. 475 (D.Or.1953).[10] But the carrier may be excused from the performance of the duty to provide transportation in emergency situations by issuing a temporary embargo, *ICC v. Chicago R.I. & P. Ry.*, 501 F.2d 908 (8th Cir. 1974), *cert. denied*, 420 U.S 972, 95 S.Ct. 1393, 43 L.Ed.2d 652 (1975); *Asbury v. Chesapeake and O. Ry.*, 314 F.Supp. 310, 312 (D.D.C.1970), and is excused from liability for its failure to furnish the type and number of cars requested by a shipper in cases of sudden and great demands which it could not reasonably be expected to meet in full. *Pennsylvania R.R. v. Puritan Coal Mining Co.*, 237 U.S. 121, 133, 35 S.Ct. 484, 59 L.Ed. 867 (1915). When an interstate carrier fails to furnish transportation in nonemergency circumstances without ICC approval in breach of its duty under § 1(4) of the Act or fails to provide car service in breach of its duty under § 1(11) of the Act, it is liable in damages to the "person or persons injured thereby" under § 8 of the Act.[11] *Chicago, R.I. & P. Ry. v. Hardwick Farmers Elevator Co.*, *supra*, 226 U.S. at 434, 33 S.Ct. 174; *Chicago and N.W. Ry. v. Union Packing Co.*, 373 F.Supp. 734, 737 (D.Neb.1974) (by implication), *aff'd*, 514 F.2d 30 (8th Cir. 1975).

Defendant Maine Central contends that damages are simply not available when there has been an illegal abandonment, relying on *Powell v. United States*, 300 U.S. 276, 287–89, 57 S.Ct. 470, 81 L.Ed. 643 (1937) and *S. H. & W. Lumber Co. v. California Oregon Coast R.R.*, 154 F.Supp. 152, 154–55 (D.Or.1957). As we have previously held, those cases do support the proposition that § 1(20) of the Act, providing for injunctive relief in cases of illegal abandonment, was the sole remedial counterpart to § 1(18) at all times relevant to this action. Defendant thus concludes that, because a failure to provide transportation and failure to provide adequate car service are "necessary ingredients" of an illegal abandonment, and since damages are not available for an illegal abandonment, "a *fortiori* there can be no ground for recovery by calling the abandonment 'any other name.' "[12]

Defendant's logic does evince a certain syllogistic integrity on its surface. However, it is equally logical, both formally and practically, that if Congress intended to give shippers a right to obtain damages for a temporary unexcused failure to provide transportation or adequate car service, it could not have meant to withhold that right just because the unexcused failure was of such duration as to have matured into an abandonment. The practical effect of adopting defendant's reasoning would be to encourage carriers which have breached their duties to provide transportation and car service to a shipper to abandon their service on that line altogether, on the theory that they could thereby insulate themselves from all monetary redress by the

---

**10.** "[Railroads] are quasi-public corporations or agencies engaged in the performance of public duties, intrusted to private hands to serve the public convenience." 65 Am.Jur.2d Railroads § 6, at 350. "Such duties are of a higher nature under the law than the duty to earn dividends for stockholders." *Id.*, § 11, at 352, citing *United States v. Trans-Missouri Freight Assn.*, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897).

**11.** *§ 8. Liability in damages to persons injured by violation of law*

In case any common carrier subject to the provisions of this chapter shall do, cause to be done, or permit to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in this case.

**12.** Defendant's Memorandum in Support of Motion for Summary Judgment, October 22, 1976, at 3.

shipper and, at worst, be compelled by the ICC to restore service. Where Congress has so consistently sought to prevent illegal abandonments, and has, as recently as last year, attempted to "minimize disruptions in local rail service"[13] by updating and clarifying ICC control over branch lines,[14] we conclude that defendant's theory of nonliability must fail.

In a recent case in the District of Maryland, the Interstate Commerce Commission was granted an injunction enjoining an unlawful abandonment of a six-mile track segment belonging to the Baltimore and Annapolis Railroad. A shipper and former customer on that line intervened in the action and sought ·damages under §§ 1(4) and 1(11) of the Act, a remedy it was already pursuing in an action before the ICC. While the District Court held that the shipper had elected to pursue his remedy before the ICC under § 9 of the Act,[15] and therefore dismissed the damage claim, it did discuss the theoretical availability of damages under §§ 1(4) and 1(11) in circumstances very similar to those obtaining here. That Court was not persuaded that the facts giving rise to an unlawful abandonment could not also constitute a breach of· other duties under the statute. "Because the statutory duties imposed upon carriers by the Interstate Commerce Act are overlapping to a great extent, see, e. g., 49 U.S.C. §§ 1(4), 1(6), 1(9), 1(11), 1(12), 1(18), 3(1), 6(1), 15(1) (1970), a particular set of facts could conceivably establish a violation of any number of them." *ICC v. Baltimore & A. R.R.*, 398 F.Supp. 454, 469 (D.Md.1975), ·aff'd per curiam, 537 F.2d 77 (4th Cir.), cert.

denied, 429 U.S. 859, 97 S.Ct. 159, 50 L.Ed.2d 136 (1976).

Furthermore, in *ICC v. Chicago, R.I. & P. Ry., supra,* the Eighth Circuit, in determining that an illegal abandonment had occurred but remanding to the District Court for consideration of whether an injunction should issue, stated in dictum that "until abandonment is authorized [the railroad is] liable for damages resulting from breach of their duty to provide transportation, 49 U.S.C. § 1(4); *Johnson v. Chicago, M. & St. P. R.R.,* 400 F.2d 968, 971–972 (9th Cir. 1968)." 501 F.2d at 916. Finally, in the *Johnson* case, the Ninth Circuit implicitly held that damages were available in a diversity action brought under §§ 1(4) and 1(11) of the act, as well as common law, where a railroad had discontinued service following a tunnel cave-in which it made no effort to repair.

In the instant case the railroad began by publishing a temporary embargo due to circumstances beyond its control. But, as we held in the previous action, the period of discontinuation of service was extremely lengthy, "extending well beyond any reasonable time required to repair the flood damage," despite the fact that the railroad was clearly financially and physically able to repair the damage and resume service.[16]

■ We conclude that the mere fact that a railroad so drastically fails to provide transportation and car service as to constitute an illegal abandonment does not insulate it from liability for damages for the breaches of its duties under §§ 1(4) and 1(11) of the Interstate Commerce Act. *Ac-*

---

**13.** S.Rep.No.94–499, 94th Cong., 2d Sess., 2, 29 (1975).

**14.** For a discussion of ICC activity in the area of illegal abandonments prior to the Railroad Revitalization Act of 1976, *see* K. Nickolai and M. Katskee "Railroad Abandonment: The Disappearing Railroad Blues," 8 Creighton L.Rev. 391 (1974).

**15.** *§ 9. Remedies of persons damaged; election; witnesses*

Any person or persons claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter

provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter in any district court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt. . . .

**16.** *ICC v. Maine Central R.R.,* Civil No. 74–81, at 13 (D.Vt. July 18, 1974), *aff'd,* 505 F.2d 590 (2d Cir. 1974).

*cord, ICC v. Baltimore & A. R.R., supra,* at 467 (dictum). Because we hold that Ethan Allen may, upon proper showing thereof, be entitled to damages under the Interstate Commerce Act, we need not at this time reach the question of whether damages are also available under the Vermont statute or at common law.

Having determined that the defendant is not entitled to judgment as a matter of law, Fed.R.Civ.P. 56(c), the motion for summary judgment is DENIED.